In the

# United States Court of Appeals

### For the Seventh Circuit

No. 02-2892

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EUGENE HAYWOOD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 01-CR-10049—**Michael M. Mihm**, *Judge.*

ARGUED FEBRUARY 18, 2003—DECIDED MARCH 31, 2003

Before RIPPLE, DIANE P. WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* After spending most of the day driving a car, this was not the welcoming party Eugene Haywood hoped to see. One February day in 2001, Haywood returned home to Peoria, Illinois, after driving to and from Chicago in a rented Oldsmobile Alero. He parked the car, got out, and locked the doors to find two police officers waiting for him. As he began walking toward the front of the car, the officers identified themselves and had Haywood place his hands on the car's roof. When asked, Haywood admitted that he did not have a valid driver's license, at which point he was arrested for driving with a revoked license.

The officers then searched the car. Under the hood they found a white sock with over 250 grams of crack cocaine. In the car they found an open, half-empty bottle of champagne cognac. They also found the rental agreement for the car, which was registered to Yatisha Sturdivant, Haywood's girlfriend, who had given him permission to drive the car. Under the rental agreement, only Sturdivant was permitted to drive the car.

As it turned out, this was not Haywood's first encounter with crack cocaine. On at least three prior occasions, Haywood and his friend, Walter Jackson, drove from Peoria to Chicago in search of cheap drugs. Each time, they followed the same plan, buying over a pound of crack and stashing it in a towel under the hood for the drive back to Peoria, after which they would split up the drugs and sell them. The night before Haywood's arrest, he and Jackson discussed driving to Oklahoma in search of even cheaper crack.

Haywood was first brought up on charges by the State of Illinois. Haywood filed a motion to suppress the fruits from the search of the car (most notably the drugs). But the state trial judge denied that motion, finding that Haywood lacked standing to challenge the search because the owner of the rental car (Enterprise) never gave him permission to drive or possess it. The federal government then got into the case by obtaining an indictment charging Haywood with conspiracy to distribute more than 50 grams of cocaine base and possession of more than 50 grams of cocaine base with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). In the federal district court, Haywood again filed a motion to suppress the evidence found in the car. The district court agreed that Haywood lacked standing to challenge the search and denied the motion.

After a jury found Haywood guilty on both counts, Haywood filed a motion for a new trial and a judgment of

acquittal on the conspiracy charge, claiming that the evidence was not sufficient to support the jury's verdict. The district court denied the motions and Haywood appeals.

To determine whether a defendant has standing to challenge a police officer's search, we have applied a two-pronged test, essentially asking whether there is both a subjective and an objective right to privacy. *See United States v. Walker*, 237 F.3d 845, 849 (7th Cir. 2001).

The parties agree that Haywood sufficiently demonstrated a subjective expectation of privacy. The question, then, is whether that expectation is one that society recognizes as legitimate and reasonable. *See Walker*, 237 F.3d at 849; *United States v. Torres*, 32 F.3d 225, 230 (7th Cir. 1994) ("A legitimate expectation of privacy is an expectation . . . which society is prepared to recognize as reasonable." (quoting *United States v. Tobin*, 890 F.2d 319, 324 (11th Cir. 1989))).

In *Walker*, we held that an authorized driver of a rental car has standing to challenge a search of the car, but we have not addressed the question with respect to an unauthorized driver. Several circuits have examined that issue, though they have failed to reach a consensus. The Fifth and Eighth Circuits have held that an unauthorized driver of a rental car has standing as long as the authorized driver has given him permission to drive the car. *See United States v. Best*, 135 F.3d 1223 (8th Cir. 1998); *United States v. Kye Soo Lee*, 898 F.2d 1034 (5th Cir. 1990). The Fourth, Tenth, and Eleventh Circuits, on the other hand, have looked solely to the rental agreement, holding that a driver who is not authorized by the rental company to operate the car does not have standing. *See United States v. Wellons*, 32 F.3d 117 (4th Cir. 1994); *United States v. Roper*, 918 F.2d 885 (10th Cir. 1990); *United States v. McCulley*, 673 F.2d 346 (11th Cir. 1982). Finding a middle ground, the Sixth Circuit has applied a

more fact-based approach. *See United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001). In *Smith*, the court created a presumption that an unauthorized driver does not have standing but found that the defendant's unique circumstances—he was married to the authorized driver, was a licensed driver, and had paid for the rental car—were enough to overcome that presumption.

For now, we do not have to decide which, if any, of the other circuits' rules or presumptions makes the most sense. That's because Haywood was not simply an unauthorized driver, he was also an unlicenced one. Haywood should not have been driving any car, much less a rental car that Enterprise never would have given him permission to drive. As a result, Haywood's expectation of privacy was not reasonable. Unlike the defendant in *Smith*, there was nothing unique about Haywood's situation that suggests an exception should be made. Therefore, Haywood lacked standing to challenge the search.

Haywood next argues that the evidence was not sufficient to support the jury's verdict on the conspiracy charge. In order to uphold the verdict, we need only to find that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Thomas*, 284 F.3d 746, 751 (7th Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Simply put, a conspiracy is an agreement to commit a crime. *United States v. Zarnes*, 33 F.3d 1454, 1465 (7th Cir. 1994). We have further defined a conspiracy to be

> an agreement with a particular kind of object—an agreement to commit a crime. When the sale of some commodity, such as illegal drugs, is the substantive crime, the sale agreement itself cannot be the conspiracy, for it has no separate criminal object. What is required for conspiracy in such a case is an agreement to commit some other crime beyond the crime constituted by the [sale] agreement itself.

*United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 1993) (en banc).

Haywood does not challenge the jury instruction on conspiracy, which the district court based on the Seventh Circuit buyer-seller pattern instruction. Haywood's jury was told:

> The existence of a simple agreement of two persons to pool their money and to buy drugs together, without more, is not sufficient to establish a conspiracy, even where each buyer intends to resell cocaine.
>
> In considering whether a conspiracy or a simple joint buyer relationship existed, you should consider all of the evidence, including the following factors:
>
> (1) Whether the transactions involved large quantities of cocaine;
>
> (2) Whether the parties had a standardized way of doing business over time;
>
> (3) Whether the parties had a continuing relationship;
>
> (4) Whether the parties had an understanding that the cocaine would be resold;
>
> (5) Whether there was to be any joint sharing of the proceeds.
>
> No single factor necessarily indicates by itself that a defendant was or was not engaged in a simple joint buyer relationship.

Haywood claims his case is similar to *Thomas*, where we found that the evidence did not support the jury's finding that a buyer-seller relationship had grown into a conspiracy, 284 F.3d at 755. That case involved a typical buyer-seller jury instruction similar to the instruction given here.

Here, the transactions involved much larger quantities of cocaine (Haywood and Jackson came away from each trip with 18 ounces, while Thomas sold his buyer ½ ounce or less in each meeting); in driving to Chicago together, then bringing the drugs back hidden in a towel under the hood and splitting them up upon their return, Haywood and Jackson had a standardized way of doing business; they had a continuing relationship, making three trips together to Chicago and talking about making one to Oklahoma; and they both knew that the cocaine would be resold.

In addition, Haywood and Jackson each had an interest in the success of the other, making them more like coconspirators than the buyer and seller in *Thomas. See Thomas*, 284 F.3d at 753 (finding no conspiracy in part because "[u]ltimately . . . we can find no evidence that Thomas ever shared with [his buyer] a stake in the success of the retail sales to [the buyer's] customers of the cocaine with which he supplied her."); *United States v. Kozinski*, 16 F.3d 795, 807 (7th Cir. 1994) ("Conspiracies are typically distinguished by cooperative relationships between the parties that facilitate achievement of a mutually beneficial goal."). *See also* Seventh Circuit Criminal Pattern Instruction No. 6.12 (1999) (factors in determining whether a buyer-seller relationship establishes a conspiracy include "[w]hether the seller had a financial stake in a resale by the buyer"). Haywood and Jackson pooled their money and shared rides to Chicago in order to buy inexpensive crack, meaning that each could run a cheaper operation—and earn higher profits—if the other succeeded.

Taking all of these facts together, the jury reasonably found Haywood guilty of a conspiracy to distribute more than 50 grams of cocaine base. Accordingly, the judgment is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*