**UNITED STATES of America,**
**Plaintiffs,**

**v.**

**Anthony ROBERTS, and Susan**
**A. Whitmire, Defendants.**

**No. 3:04cr103(1 & 2).**

United States District Court,
S.D. Ohio,
Western Division.

June 9, 2005.

the Plaintiffs to file an amended complaint in    the first instance containing such a claim.

Anne Hollenkamp Fehrman, United States Attorney's Office, Dayton, OH, for Plaintiffs.

Michael Lloyd Monta, Monta & Monta, Dayton, OH, for Defendants.

DECISION AND ENTRY OVERRULING MOTION TO SUPPRESS EVIDENCE OF DEFENDANT ANTHONY ROBERTS (DOC. # 27); DECISION AND ENTRY OVERRULING MOTION TO SUPPRESS STATEMENTS OF DEFENDANT ANTHONY ROBERTS (DOC. # 28); DECISION AND ENTRY OVERRULING MOTION TO SUPPRESS EVIDENCE OF DEFENDANT SUSAN WHITMIRE (DOC. # 30); CONFERENCE CALL SET

RICE, District Judge.

Defendants Anthony Roberts ("Roberts") and Susan Whitmire ("Whitmire") are each charged in the Indictment (Doc. # 14) with one count of conspiring to distribute and to possess with intent to distribute more than 100 kilograms of marijuana, in violation of 21 U.S.C. § 846; one count of possessing with intent to distribute more than 100 kilograms of marijuana, in violation of 21 U.S.C. § 841;and one count of traveling in interstate commerce with the intent of promoting or carrying on an illegal activity, in violation of 18 U.S.C. § 1952. Those charges stem from the stop of the motor vehicle in which they were traveling on July 5, 2004, and the subsequent discovery of approximately 400 pounds of marijuana in that vehicle. Seeking to prevent the Government from introducing evidence of that marijuana, as well as other evidence and statements obtained by the Government as a result of that stop, the Defendants filed motions seeking the suppression of that evidence and those statements. *See* Docs. # 27, 28 and 30. On October 29, 2004, and November 22, 2004, the Court conducted an oral and evidentiary hearing on those motions. In accordance with the Court's briefing schedule, the parties have filed their post-hearing memoranda. *See* Docs. ## 43, 51 and 53. The Court now rules upon those motions, beginning its analysis by setting forth its factual findings based upon the evidence presented during the evidentiary hearing.

Between 10:30 a.m., and 11:00 a.m., on July 5, 2004, Trooper Shaun Smart ("Smart") of the Ohio Highway Patrol was alone in his marked cruiser, observing eastbound traffic on Interstate 70 from a crossover located near milepost 18, in Montgomery County. Smart saw a white Buick Rendevous which appeared to be traveling at the speed limit at the end of a group of cars. As the white Buick Rendevous passed him, it attracted his attention, because it slowed down for no apparent reason. Looking through the windows of that vehicle, Smart noted that it was being driven by a white male, who the officer later discovered was Roberts, while an older white woman, who was subsequently discovered to be Whitmire, was seated in the passenger's seat.

After the Buick Rendevous had passed the crossover on which Smart was located, he pulled out and followed it. As he followed that automobile, Smart saw its driver commit three traffic offenses. In particular, Smart observed the Buick Rendevous, while it was being driven in

the right lane, come up to within one car length of the van that was traveling in the same lane in front of it. After that van had moved to the left lane to pass the tractor-trailer in front of it, Roberts stayed in the right lane and came within a car length of the tractor-trailer that the van had passed. Thereafter, the tractor-trailer pulled into the left lane to pass the truck in front of it. Once again, Roberts kept the Buick Rendevous in the right lane and came within one car length of the truck that the tractor-trailer had passed.

Smart continued to follow the Buick Rendevous until that vehicle approached the Brookville exit, where he activated the overhead lights on his cruiser in order to stop it. The Buick Rendevous pulled over after it had passed that interchange. Smart then got out of his cruiser and motioned Roberts to come to him, rather than going to the Buick Rendevous to interview Roberts. The two met about halfway between the two vehicles, and Smart asked Roberts for his driver's license. Instead of providing a driver's license, Roberts gave Smart an Arizona identification card.[1] In response to Smart's question about whether he was under suspension, Roberts said, in effect, that Arizona was supposed to be clearing up the matter and that he had receipts. Roberts also told Smart that his license was not under suspension, although the officer later learned that this statement was not true. Since Roberts had been unable to produce his driver's license, Smart directed him to accompany him to his cruiser and had Roberts sit in the back of that vehicle. As they were walking back to the cruiser,

Smart told Roberts that he would have to sit in the cruiser while his status as a licensed driver could be verified. Indeed, Smart was not going to release Roberts until he could obtain such verification and, thus, determine whether Roberts had been violating Ohio law by driving without a license.

When the two were seated in Smart's cruiser, the trooper asked Roberts, *inter alia*, whether he owned the Buick Rendevous. Roberts said that it had been rented by the passenger, whom he identified as a friend. As a consequence, Smart returned to the Buick Rendevous. He stood outside the passenger window and asked Whitmire for the rental agreement for that vehicle and her driver's license, both of which she produced. The rental agreement indicated that the Buick Rendevous had been rented by Dominic LaPlaca ("LaPlaca") in Amarillo, Texas.[2] Whitmire, in contrast to Roberts, stated that they had begun their trip in Phoenix, Arizona. In addition, the rental agreement indicated that the Buick Rendevous had to be returned to the rental agency in Amarillo the following day, July 6, 2004. Roberts and Whitmire, however, had been traveling in the opposite direction when Smart stopped them. Neither Whitmire nor Roberts was listed on the rental agreement as an authorized driver of the Buick Rendevous. While he was standing next to the vehicle and talking to Whitmire, Smart was able to observe some duffle bags in the back, which were partially covered by a blanket, and other items that were completely covered by the blanket. When he walked away from the Buick Rendevous, Smart

---

1. That identification card accurately portrayed Roberts.

2. Whitmire told Smart that she was married to LaPlaca, who had rented the Buick Rendevous. That is not true. LaPlaca testified during the suppression hearing that he and Whitmire had been together for about 23 years and that three children had been born of that relationship. He most decidedly did not testify that he and Whitmire are married, common law or otherwise.

took Whitmire's driver's license. Smart indicated that, as a result, she was not free to go.

Smart then returned to his cruiser and asked Roberts where he and Whitmire had begun their trip. Roberts said that it had begun in Peoria, Arizona. Smart also contacted his dispatcher, asking her to send a drug detection dog to the scene of the stop. He also gave the dispatcher information on Roberts and Whitmire and asked that she check whether either had the right to drive and whether a warrant was outstanding for either. He also asked for their criminal records. Since a drug detection dog from the Montgomery County, Ohio, Sheriff's Department was not available, Deputy Ronnie Lindsay ("Lindsay") of the Wayne County, Indiana, Sheriff's Department, along with his drug detection dog Reko, was sent to the location where Smart had stopped the Buick Rendevous. Lindsay arrived slightly more than 30 minutes after the traffic stop. Shortly after Lindsay arrived, Reko, a properly-trained, reliable drug detection dog, alerted on the car in which Roberts and Whitmire had been traveling, indicating that controlled substances were located inside. Smart then searched the Buick Rendevous and discovered marijuana inside the duffle bags in its back. Ultimately, approximately 400 pounds of marijuana were discovered inside that vehicle

■ As an initial matter, Roberts and Whitmire argue that their rights under the Fourth Amendment were violated when Smart stopped the Buick Rendevous in which they had been traveling.[3] This Court does not agree. It is axiomatic that the stop of a vehicle does not violate the Fourth Amendment, as long as the officer has probable cause to believe that a traffic

violation has occurred, regardless of the officer's subjective motivation for the stop. *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Section 4511.34 of the Ohio Revised Code provides that it is unlawful for the operator of a motor vehicle to follow another vehicle "more closely than is reasonable and prudent, having due regard for the speed of such vehicle ... and the traffic upon and the condition of the highway." Herein, Smart had probable cause to believe that Roberts violated § 4511.34 three times, each time he came within one car length of the vehicle in front of him (i.e., the van, tractor-trailer and truck), since it is neither reasonable nor prudent to follow a vehicle that closely on an Interstate highway. Indeed, Ohio courts have concluded that probable cause to believe that a driver has violated § 4511.34 exists under similar circumstances. *See e.g., State v. Meza,* 2005 WL 635028 (Ohio App.2005) (concluding that state trooper had probable cause to believe that the defendant was violating § 4511.34, because he was driving his car on the Ohio Turnpike one and one-half car lengths behind the car in front, rather than the recommended distance of one car length for every 10 miles per hour of speed); *State v. Bell,* 2002 WL 205502 (Ohio App.2002) (defendant's actions in following car ahead by two and one-half to three car lengths while going 60 miles per hour established probable cause to believe that he was violating § 4511.34).

■ Alternatively, the Defendants argue that, even if the traffic stop was lawful, their Fourth Amendment rights were violated, because Smart illegally *prolonged* their detentions by turning a traffic stop into a drug investigation, after the purpose

---

**3.** The Court overrules Roberts' Motion to Suppress Statements (Doc. # 28) and the branch of Whitmire's motion that is directed

at statements, since there is no evidence that either of the Defendants made an incriminating statement.

of the stop had been completed, without reasonable suspicion to believe that they were involved in activity pertaining to drugs. A motorist cannot be detained further, once the purpose of the traffic stop has been completed, unless something that occurred during the stop generates a reasonable and articulable suspicion of illegal activity. *United States v. Richardson,* 385 F.3d 625, 629 (6th Cir.2004); *United States v. Hill,* 195 F.3d 258, 264 (6th Cir.1999), *cert. denied,* 528 U.S. 1176, 120 S.Ct. 1207, 145 L.Ed.2d 1110 (2000); *United States v. Mesa,* 62 F.3d 159, 162 (6 th Cir.1995). Stated somewhat differently, the detention of a person, before the purpose of the traffic stop has been completed, does not violate the Fourth Amendment. Consequently, rather than arguing that the entirety of their detentions violated the Fourth Amendment, the Defendants contend that Smart unconstitutionally *prolonged* their detentions, after the purpose of the traffic stop had been completed.[4] For reasons which follow, the Court concludes that the purpose of the traffic stop had not been completed, by the time that Reko alerted on the Buick Rendevous, which, as is explained below, gave the officers probable cause to search that vehicle. Therefore, it rejects Defendants' contention that Smart unconstitutionally prolonged their detentions.

The purpose of a traffic stop is not limited merely to writing a traffic citation for the violation which the officer has observed. Rather, the officer must also determine whether the driver has a valid driver's license and whether one or more of the occupants is authorized to drive the vehicle. Until the officer has assured himself of those facts, the purpose of the traffic stop has not been completed. Herein, Smart had not discovered whether Roberts was a licensed driver or whether either Defendant was authorized to drive the rented Buick Rendevous at the time that Reko alerted upon that vehicle.[5] Accordingly, the purpose of the traffic stop had not been completed by that time. In addition, the Supreme Court recently held that a sniff by a drug detection dog, conducted before the purpose of a traffic stop had been completed, need not be supported by reasonable suspicion. *Illinois v. Caballes,* 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). In particular, the Supreme Court rejected the proposition that reasonable suspicion was required, because having such a canine sniff a car transformed a traffic stop into a drug investigation. Therefore, since the purpose of the traffic stop had not been completed, it could not be argued that Smart's decision to request that a drug detection be sent to the location of the stop or the examination of the Buick Rendevous by Reko violated either Defendant's Fourth Amendment rights.

■ Each of the Defendants also argues that he or she had a reasonable expectation of privacy in the vehicle and, thus, standing to challenge the legality of the search of the Buick Rendevous. The question of whether a person who is not au-

---

**4.** Smart continually detained the Defendants, in the sense that neither was free to leave, from the moment the vehicle in which they had been traveling was stopped. Smart testified that he would not permit Roberts to leave until he could obtain verification that Roberts had a valid driver's license and, thus, determine whether he had been violating Ohio law by driving without a license. In addition, Smart testified that he took Whitmire's driv-

er's license when he first encountered her at the Buick Rendevous and that, as a result, she was not free to go.

**5.** It bears emphasis that Buick Rendevous had been rented by someone other than the Defendants and that neither of them was listed an authorized driver on the rental agreement.

thorized to drive a rental car has standing to challenge the search of the vehicle was discussed by the Sixth Circuit in *United States v. Smith*, 263 F.3d 571 (6th Cir. 2001).[6] Herein, it is not necessary for the Court to decide whether either or both of the Defendants has standing, since neither has argued that the search of the Buick Rendevous violated the Fourth Amendment. Moreover, even if that argument had been raised, the Court would have concluded that the search was legal, since Smart had probable cause to believe that controlled substances were located inside that vehicle.[7] A positive reaction by a properly-trained, reliable drug detection dog can establish probable cause for the presence of controlled substances. *United States v. Berry*, 90 F.3d 148, 153–54 (6th Cir.), *cert. denied*, 519 U.S. 999, 117 S.Ct. 497, 136 L.Ed.2d 389 (1996); *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir.1994). *See also, United States v. Hill*, 195 F.3d at 258, 273 (6th Cir.1999) ("It is well-established in this Circuit that an alert by a properly-trained and reliable dog establishes probable cause sufficient to justify a warrantless search of a stopped vehicle"), *cert. denied*, 528 U.S. 1176, 120 S.Ct. 1207, 145 L.Ed.2d 1110 (2000). Herein, the positive reaction by Reko established probable cause to search the Buick Rendevous,

since Lindsay's testimony and the parties' stipulation established that his dog was properly trained and reliable.

Based upon the foregoing, the Court overrules Roberts' and Whitmire's Motions to Suppress Evidence (Docs. ## 27 and 30, respectively).

Counsel will note that the Court has scheduled a telephone conference call on Monday, June 13, 2005, at 8:30 a.m., for the purpose of selecting a new trial date for this prosecution.

---

6. In *United States v. Haywood*, 324 F.3d 514 (7th Cir.2003), the Seventh Circuit noted that the Sixth Circuit had adopted a middle ground approach to that question, positioning itself between those circuits which have held that an unauthorized driver of a rental car has standing as long as the authorized driver has given him permission to drive (*see United States v. Best*, 135 F.3d 1223 (8th Cir.1998); *United States v. Kye Soo Lee*, 898 F.2d 1034 (5th Cir.1990)), and those circuits which have looked solely to the rental agreement, holding that a driver who is not authorized by the rental company to operate the car does not have standing. *See United States v. Wellons*, 32 F.3d 117 (4th Cir.1994); *United States v. Roper*, 918 F.2d 885 (10th Cir.1990). In *Smith*, the Sixth Circuit created a presump-

tion that an unauthorized driver does not have standing, but found that the defendant's unique circumstances—he was married to the authorized driver, was a licensed driver, and had paid for the rental car—overcame that presumption.

7. *See United States v. Cope*, 312 F.3d 757, 775 (6th Cir.2002), *cert. denied*, 540 U.S. 871, 124 S.Ct. 198, 157 L.Ed.2d 130 (2003) (noting that the automobile exception to the warrant requirement is applicable even in non-exigent circumstances, as long as the vehicle is mobile and law enforcement officers have probable cause to believe that it contains incriminating evidence).