In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1177

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KENYON R. WALTON,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:12-cr-30266-MJR-1 — **Michael J. Reagan**, *Judge*.

ARGUED MAY 28, 2014 — DECIDED AUGUST 13, 2014

Before FLAUM, MANION, and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. Kenyon Walton appeals the district court's denial of his motion to suppress for lack of Fourth Amendment standing. For the reasons explained below, we conclude that Walton's alleged illegal acts did not deprive him the opportunity to vindicate his privacy interests against a government search and seizure of his rental vehicle. We therefore reverse the district court's decision and remand for further proceedings.

## I.  Background

On August 29, 2012, Walton was a passenger in a rented Chevrolet Suburban driven by his companion, Darrallyn Smoot, when the pair was pulled over on an interstate highway for a traffic stop by a state trooper in Madison County, Illinois. According to the trooper, Walton and Smoot were nervous, their breath heavy and their hands shaking, and they gave a confusing and implausible description of their travel plans. In particular, they apparently failed to pack any luggage for their supposed trip. Having become suspicious of the two, the trooper decided to extend the stop for approximately twenty minutes so that a police canine could smell around the car. The dog allegedly alerted while sniffing around the Suburban, and troopers then searched the vehicle and found seven kilograms of cocaine hidden in the back.

This was not Walton's first brush with the law. In fact, at the time of the stop he was on parole in Kentucky, and one of the terms of his release was that he could not leave that state without his parole officer's permission. He was also subject to regular searches by his parole officer. However, the Illinois state trooper who stopped and searched the Suburban did not yet know Walton was on parole.

Walton[1] was indicted in the Southern District of Illinois for possession with intent to distribute cocaine. He filed a motion to suppress the narcotics found in the Suburban. In opposition, the government argued that Walton lacked standing to challenge the search and seizure of the rental car for two reasons: first, he had violated his parole by leaving

---

[1] Smoot was also indicted, but her case is not part of this appeal.

Kentucky without notifying his parole officer; and second, he lacked a reasonable expectation of privacy in the Suburban.[2]

As to the first point, the government argued that because Walton was on parole and violated the terms of his release by leaving the state, he had a diminished privacy interest. It suggested that Walton could not have had a subjective expectation of privacy while he knew he was violating his parole. He should have known that he was subject to a search, and arrest, if he were found outside the state without his parole officer's permission.

In support of its second argument, the government provided evidence that Walton's rental agreement with Dollar Rent-A-Car, which authorized him to drive the Suburban, required that he have a valid license. Then the government entered two pieces of evidence to demonstrate that Walton's Ohio driver's license was suspended at the time of his arrest: (1) an email, dated October 30, 2012 and sent by the Illinois state trooper who stopped Walton, which purported to relay a state record of Walton's Ohio license status showing that it was suspended; and (2) a traffic ticket for improper signaling that Walton received in Kansas, in which a highway patrolman indicated that Walton was driving with a suspended license. The ticket is dated August 28, 2012—the very same day that Walton rented the Suburban, and the day before he was arrested.

Based on this evidence, the government argued that Walton had violated both the rental agreement that authorized

---

[2] The government also defended the reasonableness of the search and seizure, but that issue is not relevant to this appeal.

him to possess the car, and the rules by which the state of Ohio had issued him a license to drive it. As such, the government argued that Walton lacked a legitimate expectation of privacy in the Suburban. It primarily relied on two cases, *United States v. Haywood*, 324 F.3d 514 (7th Cir. 2003), and *United States v. Figueroa-Espana*, 511 F.3d 696 (7th Cir. 2007), for the proposition that the unauthorized, unlicensed driver of a rental car lacked standing to challenge a search of the vehicle.

The district court held a hearing on Walton's motion to suppress. There, Walton for the first time argued that he had a valid license on the day of his arrest, and that any record of his license being suspended was a mistake. He did not provide any evidence for that assertion, however, and did not dispute the government's evidence that his license was suspended. The district court denied Walton's motion to suppress due to lack of standing. The court found that Walton lacked a subjective expectation of privacy because he knew he was in violation of his parole simply by being in Illinois. It also concluded that Walton lacked an objective expectation of privacy in the Suburban because he rented it without a valid license, in violation of the rental agreement.

Walton moved for reconsideration, and this time offered evidence in support of his cause. He provided a document discussing the conditions of his parole in Kentucky. Walton argued that he was subject to search only by his parole officer, not by a law-enforcement officer who was ignorant of his parole status. He also offered two records indicating that his license was valid at the time of his arrest. First, he produced a printout of an official Kentucky record indicating that his license was transferred to Ohio and was, as of that

time, still valid. Second, he provided an official Ohio abstract of his driving record, which documented five driving "convictions" he had received while possessing an Ohio's driver's license, but nevertheless indicated that his driver's license was valid "as of 6/26/2013"—a year after the car search and his arrest. Walton noted that this abstract, which recorded incidents before his arrest, did not indicate that his license had been suspended at any point.

The district court denied Walton's motion for reconsideration. It reasoned that Walton's evidence established only that he had a valid Ohio license as of June 26, 2013, but that he could not show that he had a valid license on August 29, 2012, when he was arrested. His evidence could not rebut the government's proof that his license was suspended on the relevant date. Because Walton bore the burden of showing he had standing to challenge the search and seizure, the district court declined to reconsider its decision.

Walton then entered into a conditional guilty plea, whereby he reserved the right to challenge the denial of his suppression motion. He now appeals to this court.

## II. Discussion

In reviewing a district court's decision on a motion to suppress, this court reviews its findings of fact for clear error and its legal conclusions *de novo*. *United States v. Peters*, 743 F.3d 1113, 1116 (7th Cir. 2014). The question of Fourth Amendment standing is "one involving the substantive question of whether or not the proponent of the motion to suppress has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." *Rakas v. Illinois*, 439 U.S. 128, 133 (1978). To have

standing to challenge the search and seizure in this case, Walton bears the burden of establishing that he had both a subjective and an objectively reasonable expectation of privacy. *United States v. Walker*, 237 F.3d 845, 849 (7th Cir. 2001). An objective expectation of privacy is one that "that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361 (1967). The subjective prong of the expectations analysis presents a fact-specific inquiry that looks "to the individual['s] affirmative steps to conceal and keep private whatever item was the subject of the search." *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007).

We now must apply these principles to determine whether the district court clearly erred in determining that Walton did not have a valid license on the day of the search, and if not, whether Walton nevertheless had standing to challenge the search and seizure.

### A. Walton's License

This factual question is very murky. The government provides only two pieces of evidence indicating that Walton's license was suspended, and neither one is conclusive. First, the government points to an email from the Illinois state trooper who pulled the Suburban over, in which the trooper observes that Walton's license was "SUSPENDED in Ohio." But that email is dated October 30, 2012, and nothing in the purported driver's record indicates that Walton's license was suspended in August of 2012, when he was arrested. Indeed, the only date on the record appears to be "10/30/12"—the same date as the email. The email does not state that Walton's license was suspended on the relevant date.

The government's second piece of evidence is stronger, but still indirect. It consists of a ticket written by a Kansas highway patrolman, which has a check mark by the printed term, "Driver's license" and a written description of "other violations" that reads, "D.L. suspended." This ticket was dated August 28, 2012, at 9:00 p.m.—the night before the search of the Suburban and Walton's arrest. It is made out to a "Kenyon R. Walton," but it lists an address different from that identified in the state trooper's email discussed above. How the ticket was resolved is unknown, but it is unlikely Walton had an opportunity to challenge it after his arrest the following day.

As we have seen, Walton provided two pieces of evidence of his own.[3] A record from Kentucky shows that his driver's license had been transferred from that state to Ohio at some point. The record notes his Kentucky license had been suspended at one time, but his driving privileges were restored as of April 4, 2012. The Kentucky license, up to the point it was transferred to Ohio, was "in force." The second piece of evidence is an "abstract" of Walton's driving record in Ohio. The record reflects that the Ohio driver's license was issued on July 30, 2012. The abstract also purports to list Walton's traffic "Convictions." It lists five total offenses, but it does not state that Walton's license was ever suspended. The abstract states that his license "as of 6/26/2013" is "valid."

_____

[3] Although Walton belatedly introduced this evidence with his motion for reconsideration, the district court considered it, and the government does not argue that the court erred in doing so. And as it turns out, Walton's evidence will have no bearing on our decision.

Walton argues that the district court clearly erred by failing to infer that his license was not suspended because no suspension was listed on the Ohio abstract. The problem with this argument is that it is entirely unclear whether the abstract would list a suspension. The applicable Ohio statute provides that "the registrar of motor vehicles shall search and furnish a certified abstract of the following information with respect to any person: (1) An enumeration of the motor vehicle accidents in which such person has been involved … [and] (2) Such person's record of convictions for violation of the motor vehicle laws." Ohio Rev. Code Ann. § 4509.05. This statute makes no mention of recording whether a license has been suspended. Sections 4509.31–40 and Chapter 4510 deal with suspensions of licenses, but they do not indicate that a suspension is to be listed on the abstract.

Without the assumption that the abstract would list any past suspensions, all the document shows is that Walton's license was valid as of June 26, 2013. It is certainly possible that the license could have been suspended for, to take an example, three months, including August 28, 2012, and still be valid in 2013. *See id.* § 4510.02(B)(5) (providing for a Class E suspension lasting three months). And because Walton was arrested on August 29, 2012, it is unlikely that he committed an infraction afterward that would have caused his driver's license to be suspended as of October of 2012, the date of the state trooper's email record. Perhaps Ohio belatedly suspended his license in October for an earlier infraction, but that is pure speculation.

Of course, the government's evidence is not much stronger. The state trooper's email indicates only that Walton's license was suspended on October 30, 2012. The Kansas

ticket is the most chronologically precise evidence, but it is second-hand, based on the observations of a highway patrolman and not challenged in any adversarial legal proceeding. It is also unclear why, if Walton was driving with a suspended license, the patrolman let him go with just a ticket. The government asserts that, upon receiving the ticket, Walton let his companion Smoot drive. Letting Smoot drive would have violated Walton's rental agreement because she was not an authorized driver, but the Kansas patrolman may not have known that.

Another awkward problem for the government is that Walton successfully rented a car with his license; his Ohio license number is on the rental paperwork. The Dollar Rent-A-Car rental agreement clearly states that a driver must "warrant" that he possesses "a valid driver's license." This is significant proof that Walton did have a valid license, and the district court was not able to square this circle: "[T]he Court is unsure as to how Walton was able to enter into a rental agreement with Dollar Rent-A-Car without a valid license."

In light of the paucity of evidence either way, we cannot be confident that the district court committed clear error. And in any event, Walton bore the burden of establishing that he had standing, and we doubt that he has met that burden. Because we can resolve the standing issue regardless of whether Walton's license was valid, we may safely assume for present purposes that the government is correct that his license was suspended.

**B. Standing**

The government argues that Walton lacks standing to challenge the search and seizure because he violated his parole and because he did not possess a valid driver's license. We deal with those arguments in turn.

### 1. Expectation of Privacy as a Parolee

The government rightly points out that Walton's expectation of privacy was reduced due to the fact he was a parolee. But the Supreme Court has expressly declined to hold that a parolee categorically has no expectation of privacy in any context. *See Samson v. California*, 547 U.S. 843, 850 n.2 (2006) ("Nor . . . do we equate parolees with prisoners for the purpose of concluding that parolees, like prisoners, have no Fourth Amendment rights. That view misperceives our holding. If that were the basis of our holding, … there would have been no cause to resort to Fourth Amendment analysis.") (internal citations omitted); *United States v. Williams*, 702 F. Supp. 2d 1021, 1029 (N.D. Ill. 2010) ("[T]he Court [in *Samson*] specifically explained in the opinion that it was not concluding that parolees have no expectation of privacy."). *Samson* did hold that, under California's parole system, a suspicionless search of the petitioner in that case did not violate the Fourth Amendment. But the Court never held that the petitioner or any other parolee lacked standing to challenge a search. Indeed, as the Court observed, the Fourth Amendment analysis conducted in the opinion would have been unnecessary had the petitioner lacked standing.

Possibly anticipating that problem, the government asserts that Walton lacked a subjective expectation of privacy because he knew that he was violating parole by leaving

Kentucky without permission, and that he therefore knew he was subject to being stopped and searched at any time. But that modification does little to limit the breadth of the government's position. Its rule would still deny virtually any parolee standing to challenge a search. After all, if a parolee seeks to suppress evidence of a parole search, it will almost always be the case that the government found evidence of illegal activity, known to the parolee, that would violate the conditions of parole. Under the government's proposed regime, any parole search that uncovered a violation, even if it were conducted at random and based on no suspicion whatsoever, would escape Fourth Amendment scrutiny entirely if the parolee subjectively knew that she was violating parole. The government does not cite a single case for that astonishing proposition, because there is none. In fact, the Third Circuit has held that a parolee has an expectation of privacy in a car even if he is driving without a license in violation of the conditions of his parole. *See United States v. Baker*, 221 F.3d 438, 440, 443 (3d Cir. 2000). Society is prepared to accept that parolees have an expectation of privacy, even if they are up to no good. *Samson* does teach that a suspicionless search of a parolee may, under the "totality of the circumstances," be reasonable. 547 U.S. at 852. But it does not deprive a defendant of a chance to challenge the reasonableness of the search.

Walton's behavior is also entirely consistent with his subjective belief that he had a reasonable expectation of privacy in the vehicle despite his parole violation. He rented the vehicle alone, with himself listed as the only authorized driver. The fact that he transported a passenger with him and let her drive a portion of his journey is not evidence that he thought the car was open to public scrutiny and search. *See Walker*, 237 F.3d at 848–49 (an authorized driver of a rental car can

object to a search of the car "and its occupants."). Walton's subjective expectation of privacy was not defeated by his knowing parole violation.

## 2.  Expectation of Privacy in a Rental Car

### a)  Legal Background

In *Walker* we held that "a person listed on a rental agreement as an authorized driver has a protected Fourth Amendment interest in the vehicle and may challenge a search of the rental vehicle." 237 F.3d at 849. Indeed, "[a] person listed as an approved driver on a rental agreement has an objective expectation of privacy in the vehicle due to his possessory and property interest in the vehicle." *Id.* That is a very clear statement, presented without qualification, in support of Walton's position. In that case we held that Walker had standing to challenge a search of a rental car that uncovered a firearm and drugs on a passenger. *Id.* at 848-49. Our ruling did not state whether or not Walker had a valid license, and it does not indicate that the status of the license would have influenced the analysis. We simply stated that "a person listed on a rental agreement as an authorized driver" had Fourth Amendment standing. We must therefore decide whether the suspended license distinguishes this case from *Walker*.

The government, by contrast, wants to resolve this appeal under an expansive reading of *Haywood*. In that case, the defendant was not an authorized driver of the rental car that was searched, and he also drove the car with a revoked license. We readily concluded that Haywood lacked standing to challenge a search of the rented car:

> Haywood was not simply an unauthor-
> ized driver, he was also an unlicenced
> one. Haywood should not have been
> driving any car, much less a rental car
> that Enterprise never would have given
> him permission to drive. As a result,
> Haywood's expectation of privacy was
> not reasonable.

324 F.3d at 516. The government cites the case for the propo-
sition that "an unlicensed and unauthorized driver does not
have standing to contest the search of a rental car." Appel-
lee's Br. at 14. But of course, Walton was the authorized
driver listed under the rental agreement. The *Haywood* court
necessarily relied on both the fact that Haywood was unau-
thorized, and the fact that he was an unlicensed driver. Wal-
ton's authorization to drive the rental car distinguishes this
case from *Haywood*.

The district court also cited *Figueroa-Espana*, 511 F.3d at
703–04. In that case the court found that "[i]n addition to be-
ing an unauthorized driver, Figueroa–Espana failed to pro-
duce a valid driver's license to either trooper. He should not
have been driving any vehicle, let alone a truck of dubious
origins, and therefore his objective expectation of privacy in
the truck was neither legitimate nor reasonable." *Id.* at 704.
Again, we noted that the defendant had failed to establish he
was authorized to drive the vehicle. The court believed that
the question of authorization was unclear, and that the de-
fendant had failed to satisfy his burden of establishing
standing. That case is therefore also distinguishable.

It is also important to note that all three of the above cas-
es—*Haywood*, *Figueroa-Espana*, and *Walker*—left open the

question of whether an unauthorized, but properly licensed, driver of a rental car enjoys standing to challenge a search of the vehicle. *See Haywood*, 324 F.3d at 516 ("[W]e have not addressed the [standing] question with respect to an unauthorized driver."). To frame the matter more systematically, *Walker* established that an authorized, (presumably) licensed driver of a rental car had standing. In *Haywood* and *Figueroa-Espana*, we concluded that an unauthorized, unlicensed driver lacked standing. The question of whether an unauthorized, properly licensed driver of a rental car enjoys standing remains undecided, and we also leave that issue for another day. Finally, this case presents the new, and hopefully rare, instance in which a defendant somehow manages to become the authorized driver of a rental car without having a valid license. We present this information in chart form for convenience.

|                | Licensed   | Unlicensed      |
| -------------- | ---------- | --------------- |
| Authorized     | Standing   | Walton's case   |
| Unauthorized   | Undecided  | No standing     |

Some of our sister circuits have touched upon the specific license issue in this case. The Eighth Circuit recognized the standing of a defendant who drove a rental car with a suspended license. *See United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998) (an unauthorized driver of a rental car with an invalid license would have standing if he had the authorized driver's permission to use the car). So has the Ninth Circuit. *United States v. Thomas*, 447 F.3d 1191, 1195–96 (9th

Cir. 2006) (same). But both these decisions also grant standing to a defendant not named on the rental agreement if she has permission from the authorized driver, a situation that we have not decided. On the other hand, courts that deny standing to unauthorized drivers typically do so without considering whether the driver has a valid license. *See United States v. Wellons*, 32 F.3d 117 (4th Cir. 1994); *United States v. Roper*, 918 F.2d 885 (10th Cir. 1990); *United States v. McCulley*, 673 F.2d 346 (11th Cir. 1982). The Sixth Circuit is unique in considering possession of a valid license as one factor in the standing analysis. *United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001). In *Smith* the court granted standing where the driver was unauthorized, but had a valid license. This case involves a driver with no valid license, but who was authorized. In short, decisions of our fellow circuits are conflicting and of limited help in this very peculiar case.

### b) *Haywood* and *Figueroa-Espana*

In urging that *Haywood* and *Figueroa-Espana* are dispositive, the government must read these two cases for a broad principle. One possible reading comes from the language that appears in both opinions. *Hayward* observed that, due to his suspended license, "Haywood should not have been driving any car." 324 F.3d at 516. Likewise, *Figueroa-Espana* stated that the defendant "should not have been driving any vehicle." 511 F.3d at 704. This language points to two possible readings of these cases, either of which, if valid, would require an affirmance.

First, perhaps *Hayward* and *Figueroa-Espana* stand for the proposition that a driver with an invalid license loses an expectation of privacy in any car. After all, driving without a license is illegal. But that principle cannot be correct. A driv-

er of a car does not lose all Fourth Amendment protections simply because his license is invalid. *See United States v. Griffin*, 729 F.2d 475, 480, 483 n.11 (7th Cir. 1984) (a driver lacking a valid license "had standing to claim that the inventory search of the 1982 Corvette violated [his] privacy rights"); *United States v. Fiala*, 929 F.2d 285, 287 n.1 (7th Cir. 1991) (a driver whose license was suspended "may properly challenge the constitutionality of [a] traffic stop"). The opposite principle would lead to absurd results. Courts do not resolve car search cases in which the driver has a suspended license by omitting the Fourth Amendment analysis and simply concluding the driver lacks standing. In *Arizona v. Gant*, 556 U.S. 332 (2009), the defendant was arrested for driving with a suspended license, and his car was searched. If it were true that a suspended license stripped a driver of Fourth Amendment standing, *Gant* would have been an easy standing case. Instead, the Court proceeded to conduct a Fourth Amendment analysis as to whether the search was reasonable. Although we must take care not to mistake the Court's silence for its view of substantive Fourth Amendment law, we of course have long followed the same practice in our decisions. *See, e.g.*, *United States v. Balanow*, 528 F.2d 923, 924 (7th Cir. 1976) (discussing reasonableness of an impound search following arrest for driving with a suspended license). *Haywood* and *Figueroa-Espana* cannot be read this broadly.

The government's preferred, narrower reading of *Haywood* and *Figueroa-Espana* is that, because a license is typically a prerequisite for renting the car, a driver who lacks a valid license has no objective expectation of privacy therein. *See* Appellee's Br. at 14 ("[Walton's] violations of the terms of the agreement rendered his possession of the vehicle unau-

thorized."). If Walton lacked a valid driver's license, the argument goes, he necessarily cannot be an authorized driver of a rental car. This interpretation was the basis for the district court's ruling:

> The fact that Walton had a suspended license calls into question the "authorization" granted to him by Dollar Rent-A-Car. The Government's argument is well-taken that no car rental company would rent a car to a driver who lacks a valid license.

But this reading of *Haywood* and *Figueroa-Espana* is almost as problematic. To begin with, it is in tension with the direct statement in *Walker* that "a person listed on a rental agreement as an authorized driver has a protected Fourth Amendment interest in the vehicle and may challenge a search of the rental vehicle." 237 F.3d at 849. Walton was the sole authorized driver listed on the rental agreement. Not only that, but Dollar handed him the keys and permitted him to drive the car off the lot. This renders highly dubious the district court's assertion that "no car rental company" would do so. The government's standing argument relies on a tension, if not an outright paradox. It insists, with equal vigor, that Walton had a suspended license and that of course Dollar Rent-A-Car would never rent him a car with a suspended license. And yet here we are.

Of course, the most likely explanation—although this is speculation unsupported by the record—is that Dollar erroneously believed that Walton did have a valid license. But it is unclear how Walton can reasonably be held responsible for catching the rental company's oversight. For standing

purposes, it is typically enough that "the driver is operating [a] vehicle with the permission of the owner." *Johnson v. United States*, 604 F.3d 1016, 1020 (7th Cir. 2010) ("[A] driver of a borrowed vehicle may establish a reasonable expectation of privacy in a vehicle even though that driver is not the owner of the vehicle" because she "has the right to exclude others."). We do not generally ask if the owner was wise to let the driver borrow the car, or whether the driver operated the vehicle in a way that violated a private agreement between the two parties.

The government nevertheless insists that Walton's defective license voids any real or apparent authorization expressed in the rental agreement. It is true that the written agreement required Walton to "warrant" that he possessed "a valid driver's license." But the same form also provides that the "[v]ehicle may not be used … for any illegal purposes, or in the commission of a crime." It warns the driver in loud print that "ANY PROHIBITED USE OF THE VEHICLE … WILL VOID" the agreement. Walton therefore clearly breached the renter's agreement by transporting seven kilograms of cocaine in the trunk, irrespective of his invalid license.

The government may happily respond that Walton's cocaine transportation is simply another breach of the renter's agreement, thus strengthening its argument. But that point proves too much. If Walton lost his objective expectation of privacy in the rental car simply because a police search turned up contraband, then this (again) should have been a very simple case. He, and any other alleged drug smuggler, would be unable to challenge a search of a rental car, whether he had a valid license or not, and whether or not the po-

lice had any reason to suspect him of wrongdoing. That position, aside from significantly circumscribing Fourth Amendment rights, would also contradict the holding in *Walker*, where the defendant had standing to challenge a search that uncovered a gun in the trunk of the rental car, as well as a search of a passenger that discovered drugs. 237 F.3d at 847, 849. Carrying drugs in the car, as well as a firearm used to facilitate the commission of a drug crime, likely violated Walker's rental agreement. (Sadly, *Walker* is silent as to which agency supplied the vehicle, and on what terms.) Our court nevertheless recognized that Walker had standing. The government's proposed standing exception—that drivers have no expectation of privacy in a rental car if they breach the rental agreement—would swallow the general rule in *Walker*.

Admittedly, at least one court has suggested that a driver abandons any expectation of privacy in a rental car if he commits illegal activity in violation of the rental agreement. The defendant in *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir. 1990), was not authorized to drive the car under the rental agreement, and this distinguishes his case from Walton's. But the court went on to note, as an additional ground to deny standing, that "[t]he rental agreement also expressly forbade any use of the vehicle for illegal purposes." *Id.* We do not find this second basis for the decision persuasive, especially in light of our decision in *Walker*.

The government's proposed rule would also lead to other absurd results. Aside from carrying contraband, another use of the car prohibited by the rental agreement is to allow it to be driven "by other than an Authorized Driver." Walton engaged in this activity by letting Smoot drive. But undoubted-

ly many drivers violate that term of the agreement, yet they maintain an expectation of privacy in the car. And the agreement lists all sorts of other prohibited uses. It violates the rental agreement to "push or tow anything," or to engage in any "willful, wanton, or reckless misconduct," which includes "carrying passengers in excess of the number of seat belts in the Vehicle," "refueling the vehicle with the wrong type of fuel, i.e. diesel in gasoline engine," and "failure to use seat belts." Many drivers of rental cars must transgress certain provisions of this rental agreement, yet they undoubtedly regard the space inside the car as private while they possess it. An ordinary person would not expect his rental car to be open to public viewing or police inspection as a result. Society is willing to recognize a privacy interest in a car even if the driver does not mind her P's and Q's at all times.

One caveat is in order, however. Certain violations of a rental agreement may be so egregious that society would no longer be prepared to respect a privacy interest in the car. For example, if the driver kept the vehicle months beyond its return date, it would essentially become stolen. A driver of a stolen car does not have standing to challenge a car search. *United States v. Sholola*, 124 F.3d 803, 816 n.14 (7th Cir. 1997). But a suspended driver's license is not as severe a lapse. One would expect Dollar Rent-A-Car to ask the police to recover a stolen vehicle; by contrast, the agency apparently made insufficient attempts to verify that Walton's license was valid. And the Eleventh Circuit has held that, even if a rental car driver turns in the car a few days late, he nevertheless has an expectation of privacy in the vehicle. *United States v. Cooper*, 133 F.3d 1394, 1402 (11th Cir. 1998) (the defendant's "failure to call Budget to extend the due date four days may have

subjected him to civil liability, but it should not foreclose his ability to raise a Fourth Amendment challenge to [a] search of the rental car"). This case involves a similarly modest breach of the rental agreement.

In light of the above discussion, the dicta about "any car" in *Haywood* and *Figueroa-Espana* should be read narrowly. Those cases pertain only to unauthorized drivers of rental cars who also lack a valid license. They do not extend to every unlicensed driver of a rental car. Just as those decisions reserved the issue of an unauthorized driver with a valid license in this circuit, they also did not resolve the issue of an authorized driver without one.

### c) Application to this Case

We conclude that Walton's lack of a valid driver's license did not categorically deprive him of either a subjective or objectively reasonable expectation of privacy in the rental car. We now must decide whether the circumstances of this particular case indicate that Walton in fact had such an expectation in the rented Suburban. *See United States v. Villegas*, 495 F.3d 761, 769 n.3 (7th Cir. 2007) (discussing "the fact-specific inquiry into a reasonable expectation of privacy").

One of the central distinctions courts have drawn in similar cases is that between a driver of a car and her passenger. *See Rakas*, 439 U.S. at 149; *United States v. Price*, 54 F.3d 342, 345–46 (7th Cir. 1995). A mere passenger lacks standing because he cannot prevent the driver or owner of the car from, for example, picking up random strangers and showing them the interior of the car. A driver or owner could invite the police to enter a vehicle, or drive it to the station herself. A mere passenger has no right to ward off onlookers or pro-

tect his privacy in a car that he has no power over. Walton, by contrast, was the sole authorized driver of the car. Dollar Rent-A-Car authorized him to drive its vehicle, and Walton used the Suburban in a way that demonstrated he understood it was under his control. He invited Smoot to join him, but he appears not to have shared the car with anyone else. It does not matter that the rental agreement was legally defective because of his illegal activities or his breach of a term in the contract. As a practical matter, he still had the authority to exclude anyone from the vehicle, and had no reason to think Dollar had maintained an immediate possessory interest in the Suburban. An objectively reasonable person would not assume he had immediately lost possession of a rental car simply by, for example, not wearing his seat belt. Walton therefore enjoyed both a subjective and an objective expectation of privacy.

### d)  The Government's Remaining Arguments

The government urges us to consider Walton's knowing violation of his parole together with the fact that he drove without a license, and rule that those two circumstances combined render his expectation of privacy unreasonable. But we decline to transform two flawed contentions into a single winning argument, as if through some sort of legal alchemy. The government is correct that parolees have a reduced expectation of privacy, and the absence of a valid license certainly affects the standing of an unauthorized driver. But those two factors, even considered together, cannot entirely extinguish Walton's expectation of privacy as the authorized driver of his rental car.

At its core, the government's argument conflates Walton's alleged illegal behavior with his expectation of privacy.

Obviously, one should not rent or drive a car with a sus-
pended license, violate parole, or transport seven kilograms
of cocaine. But if the Fourth Amendment suppression rule
means anything, it must require that the police have a rea-
sonable basis for searching someone other than that—as it
turns out—the search uncovered illegal activity. That protec-
tion is compromised if Walton loses his standing even to
challenge a car search simply because of alleged unlawful
conduct that has nothing to do with his immediate possesso-
ry interest in the vehicle.

### III.    Conclusion

The government argued before the district court that
Walton's suppression motion was legally and factually in-
sufficient on its face. And on appeal, the government stated
in its brief that the Illinois state trooper who stopped Walton
did in fact know that he had breached his rental agreement
by driving with a suspended license. We also do not know
whether there was some connection between the Kansas pa-
trolman's traffic ticket and the Illinois state trooper's deci-
sion to stop the Suburban a day later. These points go to the
reasonableness of the search and seizure, and have not yet
been adequately presented in the record. The district court
should have the first chance to resolve them, along with any
other argument pertaining to the reasonableness of the stop
and subsequent search.[4] The order denying Walton's motion

---

[4] In addition to the reasonableness of the search, the duration of the sei-
zure of the vehicle may also be an issue. See *Illinois v. Caballes*, 543 U.S.
405, 407 ("A seizure that is justified solely by the interest in issuing a
warning ticket to the driver can become unlawful if it is prolong beyond
the time reasonably required to complete that mission."); *Huff v. Reichert*,
744 F.3d 999, 1002 (7th Cir. 2014) (affirming denial of qualified immunity

to suppress is REVERSED, and we REMAND for further proceedings consistent with this opinion.

---

to officer who extended traffic stop for thirty-five minutes after issuing a warning).