In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2860

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GREGORY SANFORD,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:12-cr-10069-JES-JEH-1 — **James E. Shadid**, *Chief Judge.*

ARGUED OCTOBER 6, 2015 — DECIDED NOVEMBER 25, 2015

Before WOOD, *Chief Judge*, and POSNER and WILLIAMS,
*Circuit Judges*.

POSNER, *Circuit Judge*. Chicago is a major destination city
for illegal drugs originating in Central and South America.
Interstate 55, which runs from LaPlace, Louisiana, to Chica-
go, is part of the network of north-south and west-east
highways used by drug dealers to deliver their illegal drugs
to the Windy City. See, e.g., National Drug Intelligence Cen-

ter, *National Drug Threat Assessment 2006*, "Drug Transportation Corridors," www.justice.gov/archive/ndic/pubs 11/18862/transport.htm; Kathy Sweeney, "I-Team: I-55 Drug Busts," Feb. 11, 2014, www.kfvs12.com/story/24695389/i-team-investigation-55-drug-busts (both visited Nov. 24, 2015). Drug dealers also use Interstate 55 to transport drugs from Chicago to other cities, such as Peoria (southwest of Chicago)—as we're about to see.

Shortly after midnight on February 28, 2012, an Illinois state trooper stopped a car that he had clocked speeding southbound on I-55 between Chicago and Peoria at 83 miles per hour—18 miles per hour over the speed limit. The stop led to a search of the car and the seizure of 1.5 kilograms of cocaine found in the search. Gregory Sanford, one of two passengers in the car, was prosecuted in federal court for possessing and intending to sell the cocaine that had been found. He pleaded guilty after his motion to suppress the evidence of the cocaine was denied, and was sentenced to 15 years in prison. But his plea was conditional, Fed. R. Crim. P. 11(a)(2), and allowed him to appeal to challenge the legality of the search, as he has done. And since the conditional plea did not purport to affect his right to appeal the sentence, he has also appealed from the conditions of supervised release imposed by the district judge.

The trooper who stopped the car for speeding quickly learned that it had been rented 12 hours earlier in Peoria but that neither the driver of the car nor either of its two passengers had rented it or was authorized by the rental contract to drive it. (Apparently Sanford's brother had rented it.) The trooper asked each of the three occupants for identification, and having received it returned to his car to run a criminal-

history check on each of them. The check revealed that San-
ford and the other passenger were affiliated with the notori-
ous Gangster Disciples street gang, that Sanford had a rec-
ord of 19 arrests for a variety of offenses including drug of-
fenses, and that the other passenger had a recent arrest for
manufacturing cocaine. The trooper requested that a drug-
sniffing dog be fetched to check the stopped car for drugs.
The dog arrived, alerted, and the troopers (a second had ar-
rived 14 minutes after the stop, to provide backup, and had
been joined 5 minutes later by a third trooper, who brought
the drug-detection dog) opened the trunk of the car and
found the cocaine. They gave the driver a speeding ticket
and arrested all three occupants but later released them
when they denied knowledge of the drugs. Sanford, howev-
er, was re-arrested two months later, was indicted, and
pleaded guilty as we said to possession with intent to sell the
cocaine found in the car.

He contends that the search that revealed the cocaine was
illegal because the car he was riding in had been stopped for
speeding and therefore the driver should just have been giv-
en a speeding ticket and allowed to drive off. He insists that
the trooper had no right to look up the driver's criminal his-
tory on the police car's computer, let alone the criminal his-
tories of the passengers, for there was no reason to think
them responsible for the driver's having been speeding. The
trooper acknowledged that he doesn't usually search the
criminal histories of drivers or passengers during stops for
mere traffic violations, such as speeding. But he testified that
his suspicions had been aroused by a combination of facts
that he knew, or quickly learned when he stopped the car:
drug couriers often use cars rented by third parties; I-55 is a
known drug corridor; and the occupants were nervous and

evasive, reluctant to speak, and made poor eye contact (unlike, the trooper testified, most persons in a car stopped by police for a traffic violation). In addition, although to drive from Peoria and Chicago and back again takes about four hours, the travelers had spent very little time in Chicago—enough time for a drug delivery or pickup, but not enough for a normal visit.

The trooper checked the occupants' criminal histories on the computer in his car—a procedure permissible even without reasonable suspicion, see *United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010); *United States v. Purcell*, 236 F.3d 1274, 1278–79 (11th Cir. 2001); *United States v. McRae*, 81 F.3d 1528, 1535–36 n. 6 (10th Cir. 1996)—indeed a procedure in itself normally reasonable, as it takes little time and may reveal outstanding arrest warrants. After checking for criminal histories the trooper waited for the arrival of the dog that he'd requested be brought to check for the presence of illegal drugs. While waiting he obtained additional suspicious information from the driver. She claimed to have been visiting Sanford's hospitalized grandmother, but also said that she and her passengers had left Peoria at 6 pm, which meant that the visit would have been late at night. And she couldn't name the hospital.

The total time from the initial stop of the car until the dog alerted for drugs was 26 or 27 minutes.

The district judge denied Sanford's motion to suppress the cocaine evidence mainly on two grounds: that as a passenger in the car rather than the owner, a renter, or the driver he had no standing to file such a motion, and that even if he had standing the delay had not made the search unlawful. In the judge's words,

> I don't see that there is standing to challenge the search of the car given that he [Sanford] was a passenger … . Nothing in his name, no valid license to enter into the rental agreement, any indication other than his brother entered into the rental agreement. I don't think really the officer had any reason to think that Mr. Sanford had an interest in the vehicle other than the fact that he was told that his brother rented the car. The rental agreement indicated that there was no authorization available to anybody else to drive the car. To the extent that his brother renting the car and giving it to the defendant caused some interest that may cause standing, I believe still that the combination of the matters, the facts as addressed by [the prosecutor], the speeding created the probable cause to stop the car, and then the—asking questions, the third-party rental information, gathering the information from that, the computer screen info, was not any kind of an unreasonable extension of the stop, and then finally, as the officer testified to something about the parties given his experience, the late at night, again the third-party rental information, and then the dog sniff, created probable cause for the search. So the motion would be respectfully denied.

We are mindful that the Supreme Court, in *Rakas v. Illinois*, 439 U.S. 128, 139–140 (1978), said that it was better to ask whether a person asserting a Fourth Amendment right has a personal "interest" that the search infringed than whether he has "standing" to challenge the search. But the two formulas come to the same thing, and cases continue to discuss Fourth Amendment "standing." See, e.g., *Brendlin v. California,* 551 U.S. 249, 259–60 (2007); *United States v. Padilla,* 508 U.S. 77, 80–82 (1993); *Minnesota v. Olson,* 495 U.S. 91, 101

(1990) (concurring opinion); *United States v. Wilbourn,* 799 F.3d 900, 908–10 (7th Cir. 2015); *United States v. Walton,* 763 F.3d 655, 660–66 (7th Cir. 2014); *United States v. Miller,* 799 F.3d 1097, 1103, 1107 (D.C. Cir. 2015); *United States v. Anguiano,* 795 F.3d 873, 878 (8th Cir. 2015). There is no practical difference between the two usages.

The Fourth Amendment entitles people "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." The last three "theirs"—houses, papers, and effects—have been understood compendiously as "property" in a sense not limited to the enumerated terms interpreted literally, and not even requiring ownership. E.g., *Rakas v. Illinois, supra,* 439 U.S. at 141–43. More to the point, the Supreme Court has enlarged the scope of the Fourth Amendment to include the protection of privacy. See *Minnesota v. Olson, supra,* 495 U.S. at 98–100 ("a houseguest has a legitimate expectation of privacy in his host's home" and therefore "can claim the protection of the Fourth Amendment"); *United States v. Salvucci,* 448 U.S. 83, 91–92 (1980) ("while property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of this Court's inquiry" (citation omitted)). "[A] person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable government intrusion into that place." *Rakas v. Illinois, supra,* 439 U.S. at 142. Yet even if you had no formal or informal property interest in the premises, you would still have grounds to resist a search or seizure of your person, or of personal property of yours that you might have with you in the room in which you're staying (even if you're a guest rather than

an owner or tenant), or the car in which you're riding. See, e.g., *Brendlin v. California*, *supra*, 551 U.S. at 251; *Wyoming v. Houghton*, 526 U.S. 295, 303–07 (1999); *Ybarra v. Illinois*, 444 U.S. 85, 91–92 (1979).

Sanford, though he'd not rented the car that the police stopped, could be thought to have had a property interest in it as a kind of subtenant. Although he'd driven it earlier that day, he didn't have a valid license–a situation that we said in *United States v. Haywood*, 324 F.3d 514, 515–16 (7th Cir. 2003), deprives a mere borrower of a rented car of standing to challenge a search of it. That decision, on which our subsequent decision in *United States v. Walton*, *supra*, 763 F.3d at 666, casts a shadow, may be due for reconsideration. It can be argued that if you rent a limousine, or it's lent to you by a friend, you have a possessory interest in it even though you're not expected to drive it—indeed, even if you not only don't have a valid driver's license but have never learned to drive. Sanford's situation is analogous. He was a borrower of the car.

For completeness we note the existence of a circuit split over whether an unauthorized rental-car driver has a legitimate expectation of privacy sufficient to establish standing to challenge a search. Most circuits have ruled that possessing a rental car without the rental company's permission precludes standing. But two circuits disagree and this court has yet to take sides (as noted in *United States v. Walton*, *supra*, 763 F.3d at 662–63). Compare *United States v. Kennedy*, 638 F.3d 159, 164–68 (3rd Cir. 2011); *United States v. Wellons*, 32 F.3d 117, 118–19 (4th Cir. 1994); *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir. 1990); and *United States v. Obregon*, 748 F.2d 1371, 1374–75 (10th Cir. 1984), with *United States v.*

*Thomas*, 447 F.3d 1191, 1198–99 (9th Cir. 2006); and *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998). The Sixth Circuit takes the position that an unauthorized rental-car driver may have standing in special circumstances, such as where he has a valid license, he arranged the rental, and his wife was listed as the authorized driver. *United States v. Smith*, 263 F.3d 571, 586–87 (6th Cir. 2001).

We need not resolve Sanford's standing as a borrower and passenger because even if he lacks standing to challenge the search on the basis of having a quasi-property right of some sort in the car, he has standing to challenge the seizure of his person (in the loose sense in which "seizure" is used in Fourth Amendment cases) when the car was stopped by the police. Therefore he has standing to challenge any search that resulted from his seizure if the seizure was unlawful. *Brendlin v. California, supra*, 551 U.S. at 256–59; *United States v. Wilbourn, supra*, 799 F.3d at 908–10; *United States v. Bueno*, 703 F.3d 1053, 1055–62 and 1059 n. 3 (7th Cir. 2013), vacated in part on other grounds, *Gonzalez-Zavala v. United States*, 133 S. Ct. 2830 (2013). Such a seizure, of driver and passengers alike, occurs every time police stop a car that has a passenger, but is lawful if there's reason to think the driver is violating a traffic law, as in this case.

Recently, however, the Supreme Court has held that such a seizure turns unlawful if it is prolonged in order to conduct a dog sniff (which requires bringing the dog to the scene of the stop, and therefore takes a while), without reasonable suspicion that there are illegal drugs secreted in the stopped vehicle. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614–16 (2015). But there was reasonable suspicion in this case (in contrast, in *Rodriguez* the Supreme Court remanded

for a determination of whether there had been reasonable suspicion), given the factors listed earlier in this opinion that had made the trooper suspicious. Cf. *United States v. Finke*, 85 F.3d 1275, 1280–82 (7th Cir. 1996); *United States v. Winters*, 782 F.3d 289, 298–303 (6th Cir. 2015); *United States v. Davis*, 636 F.3d 1281, 1291–92 (10th Cir. 2011). Since the criminal-history check was justified, Sanford is left only to argue that having finished the check the police dawdled in issuing the ticket, thereby gratuitously extending the time in which Sanford was trapped in the stopped car ("seized"). The trooper who had stopped the car spent several minutes chatting with a fellow trooper about sports and a euchre tournament while twice stating (then quickly correcting himself) that he wanted to wait for the dog to arrive before completing the writing of the ticket. The criminal histories that he uncovered in his computer search made a compelling case to wait for the dog—the trooper had reasonable suspicion of criminal activity at that point and so was justified in prolonging the stop for a reasonable time to confirm or dispel, with the dog's assistance, his mounting suspicions. Only about eight more minutes elapsed before the dog arrived. That was not an unreasonable amount of time to prolong the stop. See *United States v. Pettit*, 785 F.3d 1374, 1378, 1383 (10th Cir. 2015) (reasonable suspicion justified the trooper in prolonging the stop by 15 minutes to wait for the arrival of the drug dog); *United States v. Lyons*, 486 F.3d 367, 372 (8th Cir. 2007) (a 31-minute wait for the drug dog to arrive was reasonable because there was reasonable suspicion that drugs would be found in the vehicle).

There is a further wrinkle. The car-rental contract prohibited anyone from driving the car whom the contract didn't authorize to drive it, and none of the three persons in the car

was authorized. The trooper could therefore have called the rental agency, alerted it to the situation, and in all probability have been asked by the agency to impound the car, as in *United States v. Wellons, supra,* 32 F.3d at 118–19. The trooper didn't do that (we're not told why he didn't), but the fact that he could have, with predictable results, further attenuates the defendant's claim to have been unjustifiably seized.

So Sanford's conviction was proper, but he also challenges the conditions of supervised release that the district judge imposed. The government acknowledges that this part of his appeal has solid merit, and so agrees with Sanford that the case should be remanded with instructions that the judge reconsider the sentence he imposed, though just the conditions of supervised release and not the prison term.

There are three problems with the conditions of supervised release that the judge imposed. First, the written judgment contains thirteen so-called "standard" conditions of supervised release that the judge did not mention at the sentencing hearing. Those conditions must be stricken because only punishments stated orally, in open court, at sentencing are valid. *United States v. Johnson*, 765 F.3d 702, 711 (7th Cir. 2014). Second, the judge did not attempt to justify the conditions that he did impose at the sentencing hearing, as required by *United States v. Thompson*, 777 F.3d 368, 373 (7th Cir. 2015). And third, a number of the conditions listed in the written judgment suffer from a variety of infirmities identified in decisions such as *Thompson* and *United States v. Kappes*, 782 F.3d 828 (7th Cir. 2015), decisions rendered after Sanford had been sentenced.

We need to consider whether the resentencing hearing that we're ordering should be limited to conditions of su-

pervised release, or whether the judge should be permitted to alter the prison sentence that he imposed. The second course generally is preferable, given the interplay between the two types of sentencing. See, e.g., *id*. at 867. Although conditions of supervised release take effect (as the name implies) only upon the defendant's release from prison, realistically they are a form of custody, like parole, because they impose significant limitations on a person's freedom. Consider for example the common condition of supervised release that requires the permission of the defendant's probation officer to take a trip outside the federal judicial district in which the defendant lives. See 18 U.S.C. § 3563(b)(14); U.S.S.G. § 5D1.3(c)(1).

The more severe the conditions of supervised release, the stronger the case for a lighter prison sentence; the less severe, the weaker that case. Sanford was given a prison sentence that, though long, was 82 months below the bottom of his guidelines range. So were the district judge on remand to lighten the conditions of supervised release that he imposed, which he has now to reexamine, he might wish to lengthen the prison sentence, as a kind of compensation. Conversely, were he to impose more severe (and this time valid) conditions of supervised release, he might wish to shorten Sanford's prison sentence somewhat. But Sanford and the government had agreed to the 180-month prison term as part of his guilty plea, and the district judge's acceptance of the plea agreement will bind the district judge on remand just as it does the parties. Fed. R. Crim. P. 11(c)(1)(C); see also Advisory Committee Note, 1999 Amendments. "[O]nce the court has seen the presentence report and given its approval, it is not free to revisit the plea agreement simply because, for whatever reason, the defendant later comes back to the court

for resentencing." *United States v. Ritsema*, 89 F.3d 392, 401 (7th Cir. 1996). A contrary rule would deprive plea agreements governed by Rule 11(c)(1)(C) of finality and indeed render them illusory by depriving both sides of the benefits they had anticipated from entering into such agreements. *United States v. Ritsema, supra*, 89 F.3d at 400–01; see also *United States v. Ray*, 598 F.3d 407, 408–11 (7th Cir. 2010); *United States v. Main*, 579 F.3d 200, 202–04 (2d Cir. 2009); *United States v. Olesen*, 920 F.2d 538, 539–43 (8th Cir. 1990). Because the district judge accepted Sanford's Rule 11(c)(1)(C) plea agreement, the judge is bound by the agreement's terms. And he can't retract that acceptance even if our remand makes the judge regret having accepted it. *United States v. Ritsema, supra*, 89 F.3d at 401. In short he can revise the conditions of supervised release but he can't alter the term of imprisonment.

The judgment is therefore

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.