In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3626

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENYON R. WALTON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:12-cr-30266-MJR-1 — **Michael J. Reagan**, *Chief Judge.*

ARGUED MAY 23, 2016 — DECIDED JUNE 30, 2016

Before BAUER, POSNER, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Illinois State Trooper Nate McVicker
pulled over defendant-appellant, Kenyon Walton, in Madison
County, Illinois, on August 29, 2012, for routine traffic viola-
tions. During the course of the traffic stop, Officer McVicker
discovered that Walton possessed a large quantity of cocaine.
Walton was indicted on September 5, 2012, in a single count for
possession with intent to distribute cocaine in excess of five

kilograms, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii) and 18 U.S.C. § 2.

On October 22, 2012, Walton filed a motion to suppress the cocaine, arguing that the traffic stop violated his Fourth Amendment rights. There was a hearing on the motion on January 29, 2015.[1] At the hearing, Officer McVicker testified regarding the incident and the government submitted an audio/video recording captured on Officer McVicker's dash-board camera. The district court denied Walton's motion on August 10, 2015, and Walton appealed. We affirm the denial of the motion to suppress.

## I. BACKGROUND

At approximately 8:43 a.m. on August 29, 2012, Officer McVicker pulled over a 2012 Chevrolet Suburban with Colo-rado license plates that was traveling eastbound on Interstate 70 in Madison County, Illinois. The vehicle contained two people: Darrallyn Smoot, the driver, and Walton, a passenger. Officer McVicker pulled the Suburban over because it was traveling 68 mph in a 65 mph zone, it was following the vehicle in front of it too closely, and it appeared that Walton was not wearing his seatbelt, a violation of Illinois law.

As Officer McVicker exited his squad car and walked towards the Suburban, he observed that it contained only two

---

[1] The district court originally ruled that Walton lacked Fourth Amendment standing, which we reversed and remanded the case for further proceed-ings. *See United States v. Walton*, 763 F.3d 655, 656 (7th Cir. 2014). At that time, we did not rule on whether the search and seizure were reasonable. *Id.* at 657 n.2.

people and one piece of luggage. Officer McVicker approached the passenger window and spoke to Smoot and Walton. He informed them that he intended only to issue a written warning, as opposed to a ticket. Walton told Officer McVicker that they had been stopped by police in Kansas the previous evening and had received a written warning for an improper signal. Walton gave the written warning to Officer McVicker. The warning noted that Walton was driving at that time with a suspended driver's license. Walton said that they were stopped for two hours and that the police officers had searched their vehicle. Walton also said that the Suburban was a rental car, and he provided Officer McVicker with the rental agreement. Officer McVicker learned from the rental agreement that the Suburban had been rented at the Denver International Airport, that the vehicle cost almost $1,000 to rent (including the deposit), and that Smoot was not an authorized driver. Since Walton had a suspended license and Smoot was not an authorized driver, neither individual could legally drive the Suburban. Officer McVicker informed Walton that he could have the vehicle towed, but was not going to do so.

Officer McVicker then asked the two about their travel plans. He learned that both Smoot and Walton were from Ohio. According to Walton, Smoot had driven her own car from Ohio to Colorado to visit her friends, but her car broke down while she was in Colorado. Walton, her boyfriend, flew to Colorado and rented the Suburban at the Denver International Airport to drive them both back to Ohio.

Officer McVicker testified that during this conversation, Smoot appeared "extremely nervous," as "her heartbeat [became] visible through her chest" and "her breathing pattern

was extreme." He testified that her nervousness did not decrease even after he informed her that he was only issuing a warning, instead of writing a ticket or having the vehicle towed. Officer McVicker testified that in his experience, when most innocent motorists are informed that they are only receiving a warning, the general anxiety of getting pulled over subsides.

Officer McVicker testified that in his training and experience, he can determine within one minute of pulling a car over whether there is anything that may build up or lead to reasonable suspicion of criminal activity. During that time, he looks for numerous indicators that suggest either that the motorist is innocent or that the stop should continue to confirm or dispel any notion of criminal activity. About three minutes into this traffic stop, Officer McVicker testified that he could not dispel the notion that Smoot and Walton were involved in criminal activity. But rather than tow the car and conduct an inventory search, Officer McVicker asked Smoot to accompany him to his squad car while he prepared the written warning.

Officer McVicker and Smoot both entered the squad car approximately six minutes after he had initially pulled the Suburban over. As he prepared the warning, Officer McVicker continued to ask Smoot questions. Officer McVicker testified that Smoot's body language throughout this period exhibited nervousness. He testified that she was breathing heavily, her heart rate did not decrease, she was shivering despite the summer weather, and she sat uncomfortably in the seat while situating herself as close to the passenger door as possible. Officer McVicker asked her what happened to her car. Smoot explained that it broke down in Colorado and that she was

afraid of flying, which was why Walton flew to Denver to drive her back. Officer McVicker asked her why she was in Colorado, and she said she drove out to visit friends.

Officer McVicker also asked why they rented such a large and expensive car. Smoot replied that Walton rented the car, not her, and that "guys like trucks." Officer McVicker commented that they could have rented a cheaper car to drive back in. Smoot did not respond to this comment, but noted that Walton had to fly to Denver because she was unable to rent a car. Officer McVicker testified that in his experience, criminals generally rent luxury vehicles and that larger "SUV" vehicles are better at concealing items because they have more "natural voids." Officer McVicker testified that the Suburban rental caught his attention because the two did not have a need to rent such a large and expensive vehicle; there were only two occupants and one bag of luggage, yet the car cost nearly $1,000 and seated seven to eight passengers.

Officer McVicker asked Smoot about the Kansas stop from the previous evening. Smoot initially acknowledged that the stop lasted two hours and said that the Kansas officers were "being mean," but then quickly said they were "just doing their job." Officer McVicker asked what the Kansas officers were doing for two hours, Smoot responded that the stop did not last two hours and that Walton was exaggerating when he said it had lasted that long. Officer McVicker asked again what the Kansas officers did during the stop, Smoot answered: "Nothing. They gave us our ticket and told us to go." Officer McVicker asked whether the car was searched, and Smoot said "No." Officer McVicker informed her that Walton claimed the car had been searched, but Smoot denied hearing Walton say

that. Officer McVicker testified that he found the inconsistencies regarding whether the Suburban had been searched by the Kansas police was indicative of criminal activity. He added that in his experience, criminals claim their car was searched earlier to deceive police officers into thinking that there is no need to search the vehicle again.

Officer McVicker continued to prepare the written warning for several minutes, while making casual conversation with Smoot. Officer McVicker asked Smoot when she originally went to Colorado, and she replied that she drove down three days ago to see her friends. He continued to ask questions about her trip. He learned that her car had broken down close to her friend's house, that she intended to stay in Colorado longer before her car broke down, and that Walton flew down the previous night to pick her up. He also asked what belongings were in the car. She responded there was nothing in the car but her bag.

During this time, Officer McVicker checked Smoot and Walton's licenses through his dispatch and requested their criminal histories. The radio operator read Walton's criminal history aloud over the dispatch, which included a drug trafficking offense and multiple other offenses. Around this time, Officer McVicker finished the paperwork for the written warning. He gave Smoot a copy, but had her remain in the car while he went to speak with Walton. Approximately 22 minutes had elapsed since the initial stop.

Officer McVicker approached Walton and asked him if the Kansas police had pulled him over for two hours. Walton confirmed that they had. Officer McVicker then asked him why

he rented such a large vehicle. Walton replied that it was the only one available. Officer McVicker testified that he had been to the Denver International Airport before and that there were a large number of vehicles available to rent; thus he found Walton's explanation "implausible."

Officer McVicker returned to his squad car and asked Smoot if she had any questions. He then shook her hand, told her to "drive safe," and she exited. Officer McVicker waited a few seconds after Smoot exited the car, then opened the door and asked Smoot if he could ask her a few more questions because he was "confused." Smoot was near the back of the Suburban at this point, and stopped to speak with Officer McVicker. Officer McVicker asked whether the vehicle was searched in Kansas, and she said that the police had a dog walk around the car, but that they did not search inside the vehicle. Officer McVicker then asked her if there was "anything illegal" in the Suburban. Officer McVicker testified that Smoot hesitated and looked back at the Suburban before answering "no."[2] He then asked whether specific items were in the car, such as "large sums of money," "heroin," "marijuana," "cocaine," or "weapons." Smoot answered "no" to each, but Officer McVicker testified that she hesitated and looked back at the Suburban again when he asked her if there was any "cocaine" in the car.

Officer McVicker then asked for Smoot's permission to search inside the Suburban, as well as inside her bag. Smoot consented to a search of her bag, but said that Officer McVicker

---

[2]   This conversation occurred outside the dashboard camera's view.

needed Walton's permission to search inside the Suburban. Officer McVicker then approached Walton and asked for his permission to search the vehicle. Walton refused. After Walton refused, Officer McVicker informed him that he was calling a canine unit to conduct a sniff around the vehicle, based on the reasonable suspicion that he had developed by then that the two were involved in criminal activity. This was approximately 29 minutes after Officer McVicker initially pulled Smoot and Walton over.

Officer McVicker then searched Smoot's bag, which only contained a change of clothes for one day. Officer McVicker had Smoot accompany him back to the squad car. Once they were both inside the car, he contacted dispatch to request a canine unit. This was about 33 minutes after the initial stop.

The canine unit arrived approximately 22 minutes after Officer McVicker's request to dispatch. Officer McVicker had Smoot and Walton stand away from the car so that the dog could conduct the sniff. The canine officer then walked the dog around the Suburban, which took less than one minute to complete. The dog alerted the officer that drugs were present in the vehicle. Officer McVicker then searched the interior of the Suburban. About seven minutes into the search, Officer McVicker located cocaine concealed in bags hidden in a void within the rear driver's side quarter panel. Smoot and Walton were arrested.

## II. DISCUSSION

Walton argues that the district court erred in denying his motion to suppress the cocaine because there was no reasonable suspicion supporting his continued detention after Officer

McVicker completed issuing the written warning to Smoot. "When reviewing a district court's decision on a motion to suppress, we review findings of fact for clear error and conclusions of law de novo." *United States v. Guidry*, 817 F.3d 997, 1005 (7th Cir. 2016) (citation omitted).

Neither party disputes that Officer McVicker lawfully pulled over the Suburban for perceived traffic violations: driving 68 mph in a 65 mph zone, following the car in front of it too closely, and improper seatbelt usage. The United States Supreme Court has found that officers "may conduct certain unrelated checks during an otherwise lawful traffic stop." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). "But … [an officer] may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* If there is no reasonable suspicion of criminal activity, a traffic stop can only last as long as it takes to "address the traffic violation that warranted the stop" and "attend to related safety concerns." *Id.* at 1614 (citations omitted). "[I]nformation lawfully obtained during that period may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." *United States v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007) (citations omitted).

It was permissible for Officer McVicker to ask Smoot and Walton questions unrelated to the traffic violations during the traffic stop. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). The issue in this

case is whether Officer McVicker garnered enough information to establish reasonable suspicion of criminal activity that justified further detaining Smoot and Walton *after* he completed the written warning. In analyzing this issue, we examine the "totality of the circumstances" as they existed prior to the time Officer McVicker finished issuing the written warning to Smoot. *See United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Within three to four minutes of pulling over Walton and Smoot, Officer McVicker observed that there were only two passengers with one bag of luggage in a large Chevrolet Suburban (which seated seven to eight passengers). In Officer McVicker's experience, criminals often rent large luxury vehicles for the larger areas available to conceal contraband. Officer McVicker also learned that the car was rented solely for the purpose of driving two people from Colorado to Ohio at a rental cost of almost $1,000, a price that seemed excessive to Officer McVicker, who knew they could have rented a smaller car that accomplished the same goal for around $100 or $200. Officers may rely on their experience "to make inferences from and deductions about the cumulative information available." *Hill*, 818 F.3d at 294 (citation omitted).

And, prior to issuing the written warning, Officer McVicker discovered that neither Smoot nor Walton was legally entitled to drive the car; Smoot was not authorized under the rental agreement and Walton had a suspended license. Officer McVicker could have towed the car and conducted an inventory search. We have previously noted that an officer's right to legally impound a rental car due to violations of the rental agreement weakens a defendant's argument that it was

"unjustifiably seized." *See United States v. Sanford*, 806 F.3d 954, 959 (7th Cir. 2015).

Further, by the time Officer McVicker issued the warning, he had heard conflicting stories from Walton and Smoot regarding how long the Kansas police officers had detained them the previous evening and whether the car was searched during that time. He found the inconsistency regarding the search indicated criminal activity; in his experience, criminals often claim their car was already searched to dissuade officers from conducting a "second" search.

Officer McVicker also heard Walton's lengthy criminal history read over the dispatch, which included a drug trafficking offense. *United States v. Sanford* is factually analogous. In *Sanford*, a police officer pulled over a vehicle for speeding and ran a criminal history check on the passengers. *Sanford*, 806 F.3d at 956. The check revealed that one of the passengers had 19 arrests for different offenses, including drug offenses. *Id.* The officer then requested a canine unit and detained the vehicle until it arrived. *Id.* We found that "[t]he criminal histories that [the officer] uncovered in his computer search made a compelling case to wait for the dog—the trooper had reasonable suspicion of criminal activity at that point and so was justified in prolonging the stop for a reasonable time to confirm or dispel, with the dog's assistance, his mounting suspicions." *Id.* at 959. In this case as well, Walton's extensive criminal history, which included a drug trafficking offense, further justified extending the traffic stop beyond the point of issuing the written warning, in order to further confirm or dispel Officer McVicker's "mounting" suspicion that the two were involved in criminal activity.

Finally, after Officer McVicker completed the written warning, he asked Smoot to remain in the vehicle while he asked Walton a few more questions. We have previously found that officers have a "grace period" to ask investigatory questions following the completion of a traffic stop, provided that it does not impose an "inconvenience." *United States v. McBride*, 635 F.3d 879, 882 (7th Cir. 2011) (citing *United States v. Childs*, 277 F.3d 947, 954 (7th Cir. 2002) (*en banc*)). Since Officer McVicker only spoke with Walton for about two minutes, it did not constitute an inconvenience. *Id.* During this brief questioning, Officer McVicker heard inconsistent stories regarding why Walton rented the Suburban; Smoot claimed that Walton rented it because "guys like trucks," while Walton provided the implausible explanation that it was the only car available at the Denver International Airport. Walton also confirmed that the Kansas stop lasted for two hours, again conflicting with Smoot's story.

Walton argues that Officer McVicker did not have reasonable suspicion of criminal activity prior to issuing the written warning. Thus, Walton claims that Officer McVicker violated his Fourth Amendment rights by continuing to detain him after handing Smoot the completed written warning and allowing her to exit the squad car. Walton supports his argument by focusing on the above events in isolation and providing an innocent explanation for each. However, we determine reasonable suspicion based on the totality of the circumstances; defendants cannot show that a detainment was unreasonable by simply engaging in a "divide-and-conquer" analysis. *See Arvizu*, 534 U.S. at 274; *see also United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) ("[B]ehavior which is

susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play."). In considering the situation in its entirety, we find that Officer McVicker had reasonable suspicion that Smoot and Walton were engaged in criminal activity by the time he issued the written warning to Smoot. Therefore, he was justified in detaining them beyond the time necessary to complete the written warning in order to confirm or dispel this suspicion, which ultimately led to the discovery of the cocaine. The district court properly denied Walton's motion to suppress.

Walton argues in the alternative that if there was reasonable suspicion to detain him after issuing the written warning, Officer McVicker still unreasonably prolonged the stop by failing to diligently request a canine unit to search the vehicle. He alleges that this unreasonable delay constituted an arrest without probable cause.

There is no evidence that Officer McVicker did not act diligently in requesting a canine unit. After he gave Smoot the written warning, he went to speak with Walton to confirm whether his story was consistent with Smoot's, as well as inquire more about the rental car. He then returned to the car, told Smoot she could leave, then stopped her to confirm more details about the Kansas stop as well as ask whether there were illegal items in the car. He then asked if he could search the car, to which she deferred to Walton. He asked Walton for his consent, but was denied. At that point Officer McVicker informed them he was going to request a canine unit. This all occurred within roughly ten minutes of when Officer McVicker gave Smoot the written warning. After that, he searched

Smoot's bag and accompanied her back into his squad car, at which point he contacted dispatch to request a canine unit. This took approximately four minutes. Nothing about this timeline suggests that Officer McVicker did not act diligently in requesting the canine unit.[3]

### III.  CONCLUSION

Therefore, for the foregoing reasons, the ruling of the district court is AFFIRMED.

---

[3]  Furthermore, in the interest of completeness, we note that there was nothing unreasonable about waiting an additional 22 minutes for the canine unit to arrive at the scene. *See United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) (finding that the canine unit's approximately 20 minute response time was not an unreasonable delay).