# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1910

_____

United States of America,

           Appellee,

v.

Reyes Fabian Olivera-Mendez,

           Appellant.

*
*
*
*
*   Appeal from the United States
*   District Court for the
*   District of South Dakota.
*
*
*

_____

Submitted: December 13, 2006
Filed: May 4, 2007

_____

Before BYE, COLLOTON, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Reyes Fabian Olivera-Mendez entered a conditional plea of guilty to the charge of possession with intent to distribute five grams or more of powder cocaine, in violation of 21 U.S.C. § 841(a)(1). The district court[1] sentenced him to 120 months' imprisonment and five years of supervised release. He appeals the district court's denial of his motion to suppress fifteen kilograms of cocaine found in a hidden compartment of his car. We affirm.

_____

[1]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

# I.

On the afternoon of January 13, 2005, Trooper Chris Kolz of the South Dakota Highway Patrol was on duty with his police dog, Ajax, who was trained in drug detection. Trooper Kolz observed a red Isuzu Trooper traveling east on Interstate 90. Olivera-Mendez was driving with a passenger in the vehicle. At approximately 3:14 p.m., Kolz stopped Olivera-Mendez for traveling 71 miles per hour in a 65 mile-per-hour zone. Kolz asked Olivera-Mendez for his license and registration, and while standing outside the passenger door, Kolz noticed the strong smell of an air freshener coming from the vehicle. Because it was an extremely cold day, Kolz instructed Olivera-Mendez to sit in the patrol car while Kolz issued him a warning ticket for speeding.

Once in the patrol car, Kolz questioned Olivera-Mendez about the details of his trip and about his license, his registration, and his vehicle's title. Olivera-Mendez informed Kolz that he was traveling from Washington State to his home in Indiana. His car had temporary license plates from Illinois, but it was registered in Washington. The registration and a photocopy of the vehicle's title listed the owner of the vehicle as Daniel Garcia, a third party who was not present at the stop. The title also appeared to be incomplete. In Kolz's experience, this type of document is usually two-sided, with the back side listing transfer of title, but Olivera-Mendez's photocopy included only the front side. Olivera-Mendez also provided Kolz with a photocopy of a temporary driver's license from Washington.

It took Trooper Kolz several minutes to sift through this information. First, Kolz questioned Olivera-Mendez about why the car had Illinois license plates, although Olivera-Mendez stated he lived in Indiana. Next, Kolz attempted to confirm that Olivera-Mendez owned the vehicle, even though both the title and registration listed a different owner. Kolz initially transmitted information about the Illinois license plates to a dispatcher, but when the dispatcher could not locate a matching

record in the database, Kolz tried to use the vehicle identification number. Approximately twelve minutes into the stop, Kolz confirmed that Olivera-Mendez was indeed the owner of the Isuzu. At this point, Kolz suspected that Olivera-Mendez might be transporting drugs, based on his conflicting documents, the non-present third party who was listed as the vehicle's owner, and the strong smell of air freshener coming from the vehicle. Kolz asked Olivera-Mendez whether there were any illegal drugs in the Isuzu and whether the drug dog would alert to the exterior of the vehicle, and Olivera-Mendez answered "no" to these questions. Kolz then questioned Olivera-Mendez about the photocopy of his temporary driver's license and used his radio to request a driver's license check.

While Kolz waited for the dispatcher to respond with the results of the driver's license check, he took his drug dog Ajax out of the patrol car and walked the dog around the Isuzu's exterior. Ajax alerted to the area around the rear passenger door of the car. The dog sniff lasted less than one minute, and Ajax alerted at the same time the dispatcher responded with the information about Olivera-Mendez's license. This occurred just over fifteen minutes after the stop began.[2]

Based on Ajax's alert, Kolz searched the Isuzu twice at the roadside. These searches discovered several new pieces of evidence: an air freshener in the rear cargo area, two strips of Bondo[3] on the floor, and some mismatched paint.

_____

[2]The district court stated that the amount of time taken to perform the driver's license search was unknown, but the parties agree that the record is clear on this point. A dashboard-mounted camera in Kolz's patrol car recorded the stop. The video shows that about one minute elapsed between when Kolz requested the driver's license search and when the dispatcher responded, and that Ajax alerted at the same time as the response. The video further shows that a little over fifteen minutes elapsed from the beginning of the stop until the time Ajax alerted.

[3]The magistrate judge noted that Bondo is "a trademark for a variety of materials used to repair automobile bodies." (R. Doc. 101, at 5 (quoting *The*

This evidence heightened Kolz's suspicions that the car housed a hidden compartment containing drugs.

Kolz called his supervisor and received permission to have the Isuzu towed to the Highway Patrol garage, where Kolz could conduct a more extensive search of the vehicle. The Isuzu arrived at the garage at about 5 p.m., and Kolz and several other troopers searched the vehicle continuously for approximately four hours. At 9:04 p.m., about six hours after the original traffic stop, the troopers obtained a search warrant to drill into the rear bed of the vehicle. The drill bit located a white powdery substance that field-tested positive for cocaine, and police eventually discovered a hidden compartment in the floor of the back cargo area that contained fifteen kilograms of cocaine.

Olivera-Mendez was indicted and moved to suppress the cocaine, claiming that both the initial traffic stop and the subsequent searches of the Isuzu violated the Fourth Amendment. After a hearing, a magistrate judge[4] recommended denial of the motion, concluding that Trooper Kolz "had enough reasonable suspicion to expand the scope of the traffic stop," and that the subsequent searches of the vehicle were supported by probable cause . The district court adopted the magistrate judge's report and recommendation, with supplemental comments, and denied the motion to suppress. The district court reasoned that the seizure "might have been an unreasonably long detention," but that "final determination cannot be made on this record." The court explained that the record was not "further developed on this point" because the motion was denied "on the basis of the probable cause [*sic*] to extend the scope of the traffic stop as found by Judge Simko." (R. Doc. 138, at 3]. The court

_____

*American Dictionary of the English Language* (4th ed. 2000)).

[4]The Honorable John E. Simko, United States Magistrate Judge for the District of South Dakota.

then accepted Olivera-Mendez's conditional guilty plea and sentenced him to 120 months' imprisonment and five years of supervised released.

Olivera-Mendez now appeals the denial of his motion to suppress. We review the district court's findings of fact for clear error, and review *de novo* whether the searches violated the Fourth Amendment. *Ornelas v. United States*, 517 U.S. 690, 698-699 (1996); *United States v. Sanchez*, 417 F.3d 971, 974 (8th Cir. 2005).

II.

A.

We first consider Olivera-Mendez's claim that the traffic stop was unlawful. When a traffic stop is "lawful at its inception and otherwise executed in a reasonable manner," a dog sniff conducted during the stop does not infringe on a constitutionally protected privacy interest. *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). A traffic stop can become unlawful, however, if it is "prolonged beyond the time reasonably required" to complete its purpose. *Id.* at 407.

Olivera-Mendez does not dispute that Kolz stopped him for speeding, and it is well-established that a police officer who observes a traffic violation has probable cause to stop the vehicle and its driver. *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam); *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 646 (8th Cir. 1999). When police stop a motorist for a traffic violation, an officer may detain the occupants of the vehicle while the officer "completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *$404,905.00*, 182 F.3d at 647. These may include a check of driver's license, vehicle registration, and criminal history, and the writing of the citation or warning. While the officer performs these tasks, he may ask the occupants routine questions, such as the

destination and purpose of the trip, and the officer may act on whatever information the occupants volunteer. *Id*.

Olivera-Mendez contends that Trooper Kolz, desiring to conduct a canine sniff of the vehicle, extended the traffic stop beyond the period reasonably necessary to complete it, but lacked reasonable suspicion to do so. Whether a particular detention is reasonable in length is a fact-intensive question, and there is no *per se* time limit on all traffic stops. When there are complications in carrying out the traffic-related purposes of the stop, for example, police may reasonably detain a driver for a longer duration than when a stop is strictly routine. *See United States v. Sharpe*, 470 U.S. 675, 685-87 (1985).

With one possible exception, the length of this detention was not unreasonable. Several circumstances caused Trooper Kolz's stop of Olivera-Mendez to take longer than a usual "routine" traffic stop. Olivera-Mendez presented Kolz with information that his car was registered in one state, but licensed in a second, and that Olivera-Mendez was living in a third. Both the license plate from Illinois and the photocopied driver's license from Washington were temporary. The photocopied owner's certificate appeared to be incomplete, and it listed someone other than Olivera-Mendez as the owner. Kolz's attempts to sort through Olivera-Mendez's conflicting information involved Kolz in the legitimate and sometimes time-consuming tasks of a traffic stop. These tasks took longer than normal because Olivera-Mendez presented unusual circumstances and incomplete documentation.

The one wrinkle here is that Kolz did pause during the stop to ask Olivera-Mendez whether he was carrying illegal drugs. This took about twenty-five seconds in the midst of questions about Olivera-Mendez's temporary driver's license. (Exh. 1A at 12:20-12:45). Some of our cases appear to say that merely asking an off-topic question during an otherwise lawful traffic stop violates the Fourth Amendment, *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994); *United States v.*

*Barahona*, 990 F.2d 412, 416 (8th Cir. 1993), but this view does not survive *Muehler v. Mena*, 544 U.S. 93 (2005). In *Muehler*, the Supreme Court reiterated that "mere police questioning does not constitute a seizure," *id*. at 101 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)), and rejected the suggestion that questioning on a matter unrelated to the purpose of a detention constituted a "discrete Fourth Amendment event." *Id*. at 100-01. Where the initial detention was not prolonged by questioning on unrelated matters, "there was no additional seizure within the meaning of the Fourth Amendment." *Id*. at 101. *See also United States v. Shabazz*, 993 F.2d 431, 436-437 (5th Cir. 1993).

*Muehler* does not address whether questions unrelated to the initial purpose of a detention may constitute an unlawful seizure if they extend *the length* of the detention. Three circuits have held that where a seizure of a person is based on probable cause to believe that a traffic violation was committed, an officer does not violate the Fourth Amendment by asking a few questions about matters unrelated to the traffic violation, even if this conversation briefly extends the length of the detention. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006); *United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003); *United States v. Childs*, 277 F.3d 947, 951-54 (7th Cir. 2002) (en banc); *but cf. United States v. Pruitt*, 174 F.3d 1215, 1220-21 (11th Cir. 1999). The rationale for this conclusion was stated most thoroughly by the en banc Seventh Circuit, which reasoned that in contrast to the constraints applicable to a stop based merely on reasonable suspicion, *see Terry v. Ohio*, 392 U.S. 1 (1968), the Fourth Amendment does not require the release of a person seized with probable cause "at the earliest moment that step can be accomplished," and that "[q]uestions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention." *Childs*, 277 F.3d at 953-54. *See Berkemer v. McCarty*, 468 U.S. 420, 439 n.29 (1984) ("We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop."). The police here had probable cause to seize Olivera-Mendez for driving

at an excessive speed, and we do not think Kolz effected an unreasonable seizure simply by asking three brief questions related to possible drug trafficking amidst his other traffic-related inquiries and tasks.

Assuming for the sake of argument, however, that it was unreasonable for Kolz to extend the stop by twenty-five seconds unless he had reasonable suspicion to ask questions about drug-related activity, we hold alternatively that evidence seized from Olivera-Mendez should not be suppressed. Evidence should not be excluded from trial based on a constitutional violation unless the illegality is at least a but-for cause of obtaining the evidence. *Hudson v. Michigan*, 126 S. Ct. 2519, 2164 (2006); *Segura v. United States*, 468 U.S. 796, 815 (1984). There is no basis on this record to conclude that Kolz's brief and fruitless inquiries about drugs during the course of an otherwise lawful traffic stop led to discovery of the cocaine.

The canine sniff took place during a period while Trooper Kolz was waiting for a response from a dispatcher on a traffic-related inquiry. This interval, and the accompanying canine sniff, would have occurred with or without the twenty-five second period dedicated to drug-related questions, and the use of the dog did not "change the character" of the stop. *Caballes*, 543 U.S. at 408. The drug dog Ajax was present at the scene and immediately available to conduct a sniff. Kolz's suspicions of drug smuggling were aroused prior to the questioning about drugs, (R. Doc. 101, at 3), and Olivera-Mendez said nothing in response to these few questions that heightened the suspicion of drug trafficking or prompted Kolz to conduct the sniff. In short, that portion of the seizure attributable to drug-related questioning, if unlawful, did not contribute to the discovery of the cocaine, and it was not a but-for cause of the seizure of that evidence. Accordingly, the conduct of the traffic stop provides no cause to exclude the evidence, whether or not there was reasonable suspicion for the trooper to believe before the canine sniff that criminal activity was afoot.

B.

We next consider Olivera-Mendez's challenges to the canine sniff itself, and to the searches of the Isuzu after Ajax alerted. A dog sniff of the exterior of a vehicle does not constitute a search. *Caballes*, 543 U.S. at 408-409; *United States v. Place*, 462 U.S. 696, 707 (1983). Olivera-Mendez argues that this particular dog sniff became an unlawful search when Ajax engaged in a "physically invasive inspection" by jumping on the car and scratching at the car's exterior as he performed the sniff. The video record refutes the factual premise of this claim. Ajax jumped and placed his front paws on the body of the car in several places during a walk-around sniff that took less than one minute. This minimal and incidental contact with the exterior of the car was not a tactile inspection of the automobile. *Cf. Bond v. United States*, 529 U.S. 334 (2000). It did not involve entry into the car; it did not open any closed container; and it did not expose to view anything that was hidden. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *Place*, 462 U.S. at 707. The sniff of Olivera-Mendez's car was comparable to other canine alerts evaluated by the Supreme Court, and it did "not rise to the level of a constitutionally cognizable infringement." *Caballes*, 543 U.S. at 409.

The second issue is whether Ajax's alert gave police probable cause to search the car. Olivera-Mendez does not directly challenge probable cause, but instead questions Ajax's reliability, referring to him as a "novice dog," and disparaging his score on the drug certification exam. Our cases establish that "[a] dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). The district court adopted the magistrate judge's finding that Ajax was reliable, and we will not disturb this finding unless it was clearly erroneous. *United States v. Gregory*, 302 F.3d 805, 811 (8th Cir. 2002).

We have held that to establish a dog's reliability for purposes of a search warrant application, "the affidavit need only state the dog has been trained and certified to detect drugs," and "a detailed account of the dog's track record or education" is unnecessary. *Sundby*, 186 F.3d at 876 (internal citations omitted). The standard is no more demanding where police search an automobile based on probable cause without a warrant. It is undisputed that Ajax was trained and certified in drug detection, (R. Doc. 101, at 7-9), and Ajax's trainer testified that Ajax "certainly doesn't have an issue with false indications." (H. Tr. at 419, 460). Based on this record, the district court did not clearly err in finding that Ajax was reliable, and police had probable cause to search the car after he alerted.

Olivera-Mendez claims that even if the dog's alert established probable cause to search, the examination of his car at the Highway Patrol garage was unlawful because probable cause had dissipated. *See United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993) ("[A]n investigative stop must cease once reasonable suspicion or probable cause dissipates."). His theory is that after Trooper Kolz's initial roadside searches of the car revealed no drugs or secret compartments, Kolz lacked probable cause to search the vehicle further. At the very least, Olivera-Mendez claims, probable cause had dissipated by the time police finally located the hidden compartment containing cocaine, which was roughly six hours after the initial traffic stop.

We reject this argument. Ajax's alert established probable cause to believe that the vehicle contained hidden contraband. "If probable cause justifies the search of lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). Drug couriers may conceal contraband in a manner that requires dismantling of the automobile to recover the drugs, and Kolz developed probable cause to believe that the Olivera-Mendez vehicle harbored a hidden compartment.

The probable cause to search the vehicle did not "dissipate" simply because it took a long time to complete a reasonable and thorough search of the car.

As Kolz searched the car, he made several new discoveries that further justified his continued search for contraband and sharpened the focus on a hidden compartment containing drugs. *See United States v. Patterson*, 140 F.3d 767, 773 (8th Cir. 1998); *United States v. Brown*, 49 F.3d 1346, 1350 (8th Cir. 1995). The initial roadside search revealed an air freshener in the rear cargo area of the car. This discovery supported a suspicion that Olivera-Mendez was attempting to mask the odor of illegal drugs. *See United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004). During a second roadside search, Kolz discovered two strips of Bondo in the rear cargo area. He also noticed that some of the paint on the floor of this area of the vehicle did not match, suggesting the interior of the car may have been modified. This evidence further supported Kolz's suspicion that the car contained a hidden compartment. It was reasonable at this point for officers to move the car to the Highway Patrol garage for a more extensive search, rather than disassemble the vehicle in the extreme cold. "[O]nce a reasonable basis for search of an automobile has been established, the search need not be completed on the shoulder of the road." *United States v. Casares-Cardenas*, 14 F.3d 1283, 1286 (8th Cir. 1994).

At the garage, Kolz discovered more evidence bolstering probable cause. Kolz placed Ajax inside the car, and he alerted to the rear cargo area. Kolz also discovered that the floor of the rear cargo area was about three-fourths of an inch higher than the rest of the vehicle. These discoveries, coupled with Ajax's alert, established beyond question the existence of probable cause to believe that Olivera-Mendez's vehicle had a hidden compartment containing drugs. Because there existed a fair probability that police would find contraband or evidence of a crime throughout the time they searched the car, we reject the claim that probable cause had dissipated. We need not consider Olivera-Mendez's challenges to the validity of the search warrant issued with respect to the car, because a warrant was not required. *Ross*, 456 U.S. at 809; *United*

-11-

*States v. Zucco*, 71 F.3d 188, 191-92 (5th Cir. 1995); *United States v. Patterson*, 65 F.3d 68, 71-72 (7th Cir. 1995).

\*       \*       \*

For these reasons, the judgment of the district court is affirmed.

_____