# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-2407

_____

United States of America

*Plaintiff - Appellee*

v.

CJ Bettis

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: March 15, 2019
Filed: January 10, 2020

_____

Before SHEPHERD, ERICKSON, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

CJ Bettis challenges the denial of his motion to suppress nearly 200 grams of heroin found in a rental car he was driving. Because law enforcement obtained additional facts during the traffic stop that "established beyond question the existence

of probable cause," *United States v. Olivera-Mendez*, 484 F.3d 505, 513 (8th Cir. 2007), we affirm the district court.[1]

I.

In the summer of 2016, informants tipped off police that Bettis was selling heroin in the Minneapolis area. Bettis, who has two prior convictions involving trafficking heroin from Chicago, is married to Natasha Daniels. In a previous investigation, police had searched his home and found more than 80 grams of heroin and a fake ID. When law enforcement learned that Bettis was in Chicago and likely driving a Toyota rented by Daniels, they set up surveillance on his return route.

Shortly before 5 p.m. on November 8, 2016, Minnesota State Trooper Derrick Hagen stopped the Toyota for speeding on I-94. When asked for identification, the driver presented an Illinois photo ID with the name "Vernon Silas." Trooper Hagen recognized him as Bettis. A passport identified the passenger as Dalia Taha. Bettis did not have a valid license. The rental contract showed that Daniels, who was not in the car, was the only authorized driver.

Trooper Hagen smelled a strong odor of raw marijuana coming from the vehicle. He separated Bettis and Taha and questioned both. Bettis claimed that he had traveled to Chicago with his son and attended a cousin's birthday party with Taha. When the trooper said that he smelled marijuana, Bettis admitted that he and Taha had smoked in the car. Taha told a different story. She claimed that she had been at a funeral with Bettis, but she could not remember any details, including the decedent's name. She admitted that she had smoked marijuana but not, she said, in the rental car.

---

[1] The Honorable Wilhelmina M. Wright, United States District Judge for the District of Minnesota, adopting the report and recommendations of the Honorable Tony N. Leung, United States Magistrate Judge for the District of Minnesota.

A second Minnesota State Trooper arrived and secured Taha in his patrol car. Trooper Hagen then walked his drug-detection canine around the rental car. The dog alerted to the driver's side of the vehicle, and then indicated that the center console had drugs. Law enforcement found marijuana remnants in the console.

Officers conducted a roadside search using flashlights but did not find additional drugs. Based everything they knew and because drug dealers sometimes use marijuana to mask the odor of other drugs, the officers suspected additional drugs were hidden in the Toyota. Shortly after 6 p.m. they towed the vehicle to a police garage for a more thorough search. Bettis and Taha were dropped off at a nearby gas station.

The next day law enforcement performed another dog sniff on the rental vehicle. After the dog alerted, they obtained a state court warrant to search the Toyota. This time, officers discovered approximately 200 grams of heroin in the driver's headrest. That same day Daniels called law enforcement about the vehicle, and the case agent said that it would be returned directly to the rental company.

A grand jury indicted Bettis on one count of possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B) and two counts of distribution of heroin in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C). Bettis moved to suppress the heroin found in the Toyota, arguing that law enforcement violated his Fourth Amendment rights by towing the vehicle to the police garage after the initial roadside search. The magistrate judge found that Bettis had standing to challenge the seizure of the rental car under *United States v. Muhammad*, 58 F.3d 353 (8th Cir. 1995) (per curiam) and *United States v. Best*, 135 F.3d 1223 (8th Cir. 1998). The court denied the motion to suppress because highway conditions limited the search's effectiveness and the suspects' misleading and confusing stories increased the officers' suspicions. The district court adopted the report and recommendation in full.

The court convicted Bettis on all three charges and sentenced him to 120 months in prison. Bettis timely appealed the denial of his motion to suppress the heroin found in the Toyota.[2] We have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291 and review the district court's ultimate denial of a motion to suppress *de novo*. *Best*, 135 F.3d at 1224.

## II.

We first address whether Bettis, an unauthorized and unlicensed driver of a rental car, has standing to challenge the rental car's seizure after the roadside search.

Fourth Amendment standing is "useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search," but it does not implicate Article III jurisdiction. *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018). We must determine whether Bettis "had a legitimate expectation of privacy in the area searched or the item seized." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994) (citing *Rakas v. Illinois*, 439 U.S. 128, 138–44 (1978)). There is no "single metric or exhaustive list of considerations," but a defendant's expectation of privacy must be grounded in property law or understandings that are recognized by society. *Byrd*, 138 S. Ct. at 1527. The defendant bears this burden by a preponderance of the evidence. *See United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015).

The district court correctly observed that an unauthorized driver of a rental car can establish the required expectation of privacy with "evidence of consent or permission from the lawful owner/renter." *Muhammad*, 58 F.3d at 355. We have

---

[2] Bettis appears to ask that we vacate his convictions for all counts, *see* Bettis Br. 17, but he makes no arguments challenging his two convictions for distribution of heroin. Because he has not sufficiently developed any grounds for relief, he has waived these claims. *United States v. Wearing*, 837 F.3d 905, 910 n.6 (8th Cir. 2016) (per curiam).

-4-

previously remanded a case to the district court for failing to determine whether an unauthorized driver without a valid license had "permission to use the rental automobile." *Best*, 135 F.3d at 1225. If a driver can make that showing, he "would have a privacy interest giving rise to standing." *Id.* Daniels testified that Bettis had permission to drive the Toyota, so Bettis has standing to challenge the search.

Attempting to bypass *Best*, the Government claims that the Supreme Court's *Byrd* decision "seemed to signal" that unauthorized drivers lack standing if they use a strawman to acquire a rental car because that deception strips away any reasonable expectation of privacy in the vehicle. The Supreme Court left this question unanswered, and on remand, "the government elected to abandon its position that Byrd had no reasonable expectation of privacy in the rental vehicle on this basis." *United States v. Byrd*, 2019 WL 2387190, at *4 n.5 (M.D. Pa. June 6, 2019).

Even if the Government is correct about the Supreme Court's "signal" in *Byrd*, the facts there clearly indicated a strawman transaction. Byrd accompanied Reed (the straw woman) to the rental facility and "stayed in the parking lot in the Honda while Reed went to the Budget desk and rented a Ford Fusion." 138 S. Ct. at 1524. Then, "[w]ith the rental keys in hand, Reed returned to the parking lot and gave them to Byrd." *Id.* Byrd left in the rental, and the two parted ways. *Id.* No such evidence is present here.

The Government emphasizes that Daniels gave the rental company a false address, but on cross-examination she explained it was "the address that my ID had on it and all my bank information and everything." D. Ct. Dkt. 33, Suppression Hr'g Tr. at 86:11–17. The Government also claims that renting a series of vehicles, while owning one, is suspicious. Daniels did not deny that Bettis had driven the Toyota and other rental cars, but she testified that in general, "I drive the rental car and if he needed to use a car, then he could use my vehicle." *Id.* at 81:5–6. Specifically, when she rented the car on November 1—days before Bettis left for Chicago—she did not know that he would be using it. And she thought "it was better [for Bettis] to drive

-5-

the rental car due to the mileage." *Id.* at 81:6–8. Daniels also explained that she did not list her husband on the rental contract because "[i]f you add another name they charge more." *Id.* at 85:18–23. A prosecution witness testified that "Bettis does not have a valid license so he was never listed on any agreements as an authorized driver." *Id.* at 19:7–13. The Government did not challenge or impeach this testimony. Without more, a husband and wife sharing a rental car is not inherently suspicious, nor does it suggest a strawman situation.

The Government essentially invites us to overturn our precedent recognizing that an unlicensed, unauthorized driver who has permission from the renter has a reasonable expectation of privacy. *Best*, 135 F.3d at 1225. We decline that invitation because we do not see *Byrd* as requiring that result. *United States v. Williams*, 537 F.3d 969, 975 (8th Cir. 2008) (one panel cannot overrule another). If anything, *Byrd* lends support to our precedent because it rejected the Government's argument that "drivers who are not listed on rental agreements always lack an expectation of privacy in the automobile." 138 S. Ct. at 1527–1528.

We recognize that post-*Byrd* a sister circuit[3] has concluded that an unauthorized driver operating "the vehicle illegally" does "not have lawful possession or control of the vehicle." *United States v. Lyle*, 919 F.3d 716, 730 (2d Cir. 2019). The Second Circuit found that an unlicensed driver is similarly situated to a defendant that is wrongfully present in the place searched. *Id.* Thus, an illegal act deprives the defendant of standing "when the law prevents him from being there in the first place, even with the owner's permission." *Id.*

Although it is illegal to operate a vehicle without a license, it may not have the same effect as a defendant's "wrongful" presence. The Supreme Court's examples

---

[3] Prior to *Byrd*, the Ninth Circuit agreed with our decision in *Best*. *United States v. Thomas*, 447 F.3d 1191, 1195–96 (9th Cir. 2006). Although the Seventh Circuit does not agree with us, one panel has called for reconsideration. *United States v. Sanford*, 806 F.3d 954, 958 (7th Cir. 2015).

-6-

of wrongful presence, such as a "burglar plying his trade" or a car thief, involve criminal conduct that interferes with another's valid property interest. *Byrd*, 138 S. Ct. at 1529. In contrast, the Court conferred standing on an overnight guest hiding in a closet from the police, *Minnesota v. Olson*, 495 U.S. 91, 94 (1990), and a houseguest that "kept a ready supply of heroin on hand," *Jones*, 362 U.S. at 268. Both guests had permission to use the premises and their illegal acts did not void their privacy interests.

An unlicensed driver has more in common with misbehaving guests because the illegal act of unlicensed driving does not interfere with a valid possessory interest. Here, that interest is Daniels's lawful possession of the rental car. *Byrd*, 138 S.Ct. at 1528 (seeing no reason why unauthorized user's expectation of privacy would differ when car is rented or owned). Driving without a valid license does not deprive the vehicle's renter (or owner) of that interest. *United States v. Walton*, 763 F.3d 655, 666 (7th Cir. 2014) (renter); *see e.g.*, *Arizona v. Gant*, 556 U.S. 332, 335 (2009) (owner). In *Byrd,* the Government conceded that using a handheld phone while driving (illegal in some jurisdictions), would violate the rental contract but not affect an authorized driver's expectation of privacy. 138 S. Ct. at 1529. Indeed, if illegally operating a vehicle stripped one's expectation of privacy, common traffic infractions would eviscerate the Fourth Amendment's protections. As unlicensed driving does not affect Daniels's possessory interest, her consent provided Bettis a reasonable expectation of privacy in the rental car. *Best*, 135 F.3d at 1225.

In sum, even if a strawman eliminated Fourth Amendment standing, the evidence here does not establish a strawman situation and our precedent holds that an unauthorized and unlicensed driver may challenge a search of a rental car operated with the renter's permission. Bettis has standing to challenge the search of the vehicle.

III.

Bettis does not challenge the traffic stop, the initial dog sniff, or the roadside search. Bettis Br. 19–22. He argues only that seizing and towing the Toyota after only finding marijuana debris violated his Fourth Amendment rights. *Id.* at 17. Specifically, he claims that because officers came up empty handed on the shoulder of the highway, they did not have "probable cause to believe that any additional drugs would be found in the vehicle." *Id.* at 22. We disagree.

Although a warrantless search is usually *per se* unreasonable, probable cause "justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (citation omitted); *see Chambers v. Maroney*, 399 U.S. 42, 49 (1970) (same standard for automobile seizures). Armed with probable cause, law enforcement "may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (per curiam). This "search need not be completed on the shoulder of the road." *United States v. Casares-Cardenas*, 14 F.3d 1283, 1286 (8th Cir. 1994).

We have previously rejected a defendant's claim that after the "initial roadside searches of the car revealed no drugs or secret compartments, [law enforcement] lacked probable cause to search the vehicle further." *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007). Like Bettis, Olivera-Mendez was stopped for speeding. *Id.* at 507. During the stop, the officer noticed the strong smell of air freshener. *Id.* The license plates and registration also contradicted Olivera-Mendez's claims that he owned the car and lived in Indiana. *Id.* at 507–508. After a canine alert, the officer "searched the Isuzu twice at the roadside" discovering an air freshener, two strips of car repair materials, and mismatched paint. *Id.* The police

towed the car to the Highway Patrol garage to "conduct a more extensive search of the vehicle." *Id.* Six hours later, law enforcement obtained a search warrant to drill into the vehicle and found fifteen kilograms of cocaine. *Id.*

We held that probable cause "did not 'dissipate' simply because it took a long time to complete a reasonable and thorough search of the car." 484 F.3d at 508. Indeed, some searches "require [] dismantling of the automobile to recover the drugs." *Id.* at 512. The air freshener "supported a suspicion that Olivera–Mendez was attempting to mask the odor of illegal drugs" and other indicia of contraband further justified the search. *Id.* at 513.

We reach a similar conclusion here. As the encounter with Bettis unfolded, officers developed additional evidence indicating deception and criminal conduct. Bettis gave the officer a false name and photo ID. Although he admitted Daniels was the only authorized driver, he referred to his wife as "a friend of mine." He initially lied about smoking marijuana. And Bettis and his passenger gave inconsistent stories about where they smoked and what they had done in Chicago. The canine alert, the *modus operandi* resembling Bettis's past crimes, and the knowledge that marijuana is used to mask other illegal drugs all indicated that Bettis was hiding more drugs.

As more facts came to light, law enforcement properly decided to conduct a more thorough search than flashlights on the shoulder of a busy highway allowed. It was also reasonable to perform a second dog sniff after the marijuana odor subsided. Bettis and Taha were not delayed beyond the traffic stop and no one demanded the immediate return of the vehicle. Moreover, after the second dog alerted, law enforcement obtained a valid search warrant.

Other practical concerns support the reasonableness of the officers' actions. Without a valid license, the police could not allow Bettis to drive. At the time of the stop, the rental contract in the vehicle showed that it was overdue by one day. Bettis had no proof that the contract had been extended, and his earlier deception justified

maintaining control of the rental vehicle after normal business hours. We agree with the district court that law enforcement had probable cause to seize the vehicle and continue the search.

The judgment of the district court is affirmed.

SHEPHERD, Circuit Judge, concurring in part and concurring in the judgment.

I concur in the court's opinion, including the conclusion reached in Section II that Bettis has standing to challenge the search of the vehicle. However, I do not join the court's discussion in Section II and I would simply find that the issue is controlled by Muhammad, 58 F.3d at 355 and Best, 135 F.3d at 1225.

_____