# IN THE COURT OF APPEALS OF IOWA

No. 21-1133
Filed January 11, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**STEPHEN ANDREW ARRIETA,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Worth County, Colleen D. Weiland,

Judge.


        Stephen Arrieta appeals the denial of his motion to suppress.  **AFFIRMED.**


        Colin Murphy of Gourley Rehkemper Lindholm, P.L.C., West Des Moines,

for appellant.

        Brenna Bird, Attorney General, and Thomas E. Bakke, Assistant Attorney

General, for appellee.


        Considered by Vaitheswaran, P.J., Tabor, J., and Danilson, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2023).

**DANILSON, Senior Judge.**

Stephen Arrieta appeals his conviction of possession of a controlled substance, challenging the denial of his motion to suppress evidence obtained as a result of an allegedly unconstitutional stop and ensuing search of a commercial vehicle. Arrieta contends (1) he was unlawfully detained "for the sole purpose of waiting for the drug K9," (2) the K9 and handler made physical contact with the vehicle beyond a "free air sniff" that amounted to, "in effect, a warrantless search without probable cause," and (3) the K9 was "neither reliable nor well trained and was cued to alert by the handler." Upon our review, we affirm.

## I.    *Background Facts and Proceedings*

Shortly after 12:30 p.m. on August 5, 2020, Iowa Department of Transportation Motor Vehicle Officer Taran Waalkens was operating the weigh station on Interstate 35 in Worth County when he noticed "a commercial vehicle had failed on PrePass for vehicle registration." The vehicle, driven by Arrieta, stopped at the weigh station as required. Officer Waalkens approached Arrieta and advised he was going to conduct a Level III inspection, which involved review of the "[d]river's documents and vehicle paperwork."

During the inspection of Arrieta's semi-tractor, Officer Waalkens learned the truck's vehicle identification number (VIN) was reported as stolen. Officer Waalkens requested dispatch to "check with the originating agency to see if this stolen hit was still valid." Meanwhile, as Officer Waalkens continued his inspection, he learned Arrieta was "only hauling insulation" from Minnesota to Texas, which from his experience, "wouldn't be a productive trip for the company." Officer Waalkens also noticed Arrieta was not operating an official electronic log book, so

his entries were "highly editable." Arrieta's logbook also contained "multiple inconsistencies," including instances "where [Arrieta] would change locations in Texas, sometimes over 100 miles," and on the day prior, Arrieta "logged over 770 miles in exactly 11 hours of driving time," "mean[ing] he would have averaged 77 mph during this trip." Given this information, and considering his knowledge that "I-35 is a very popular corridor for drug trafficking," Officer Waalkens "decided to call for a K9 at that point."

At around 1:34 p.m., Officer Waalkens was advised by dispatch that the originating agency reported the VIN was still active as stolen, but "with it being a valid registration and a long period of time that it was probably a valid registration," and not to "hold the driver for the stolen vehicle." Officer Waalkens continued his inspection as Deputy Jesse Luther and Titan, a narcotics detection dog, arrived at around 2:00 p.m. Officer Waalkens had Arrieta come inside the weigh station with him "to further investigate the log book" and "review[] the information" with Arrieta while Deputy Luther had Titan conduct a free-air sniff of the vehicle. Titan alerted on the vehicle for the presence of narcotics in "the sleeper part" of the semi-tractor. Upon Arrieta's consent, the officers subsequently discovered a small bag containing marijuana inside the vehicle in the area alerted to by Titan.

The State charged Arrieta with possession of a controlled substance, marijuana, and operating while intoxicated, in violation of Iowa Code sections 124.401(5) and 321J.2 (2020). The State later dismissed the operating-while-intoxicated charge. Arrieta filed a motion to suppress, which the district court

denied after a hearing.[1]  Following the trial on the minutes, Arrieta was found guilty of possession of a controlled substance, and he was sentenced to a fine of $250 and two days in jail with both days suspended.

Arrieta appeals.  Additional facts will be set forth below as relevant to his claims on appeal.

## II.      Standard of Review

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo."  *State v. Fogg*, 936 N.W.2d 664, 667 (Iowa 2019) (quoting *State v. Coffman*, 914 N.W.2d 240, 244 (Iowa 2018)).  "[W]e independently evaluate the totality of the circumstances as shown by the entire record."  *State v. Smith*, 919 N.W.2d 1, 4 (Iowa 2018) (alteration in original) (quoting *State v. White*, 887 N.W.2d 172, 175 (Iowa 2016)).  "Each case must be evaluated in light of its unique circumstances."  *Fogg*, 936 N.W.2d at 667 (quoting *Coffman*, 914 N.W.2d at 244).  We give deference to the district court's findings of fact, but we are not bound by them.  *State v. Storm*, 898 N.W.2d 140, 144 (Iowa 2017).

## III.      Discussion

Arrieta challenges the district court's denial of his motion to suppress.  He contends (1) Officer Waalkens lacked reasonable suspicion to extend the stop of his commercial vehicle "for the sole purpose" of waiting for the arrival of Deputy

---

[1] The court granted Arrieta's motion in part, with regard to a claim relating to his operating-while-intoxicated charge that was subsequently dismissed.  However, the court denied the claims relevant to Arrieta's conviction and this appeal.

Luther and Titan, (2) Titan was "neither reliable nor well trained and was cued to alert" by Deputy Luther, and (3) Deputy Luther and Titan made physical contact with his vehicle, which constituted an unlawful search. We address these claims in turn.

### A. Unlawful Detention

Arrieta does not challenge the legality of the stop. Rather, he argues the length of the detention was unreasonable and constituted an unconstitutional seizure. When a traffic stop is "lawful at its inception and otherwise executed in a reasonable manner," a dog sniff conducted during the stop does not infringe on a constitutionally protected privacy interest. *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005). A traffic stop can become unlawful, however, if it is "prolonged beyond the time reasonably required" to complete its purpose. *Id.* at 407.

As noted, Arrieta was operating a commercial vehicle and was required to stop at the weigh station. *See generally State v. Steward*, No. 0-801, 2001 WL 98397, at *2 (Iowa Ct. App. Feb. 7, 2001) (noting "[t]he commercial trucking business is a closely regulated industry" and the "expectation of privacy is diminished for owners or operators of closely regulated industries"). Officer Waalkens decided to conduct a Level III inspection, which he testified involved reviewing several documents, including Arrieta's commercial driving license, log book, truck and trailer registrations, fuel tax receipts, and bills of lading. Aside from Arrieta's VIN being reported as stolen, Officer Waalkens observed several "discrepancies" in Arrieta's records, which prompted him to "request a K-9."

Meanwhile, Officer Waalkens continued his investigation, and when Deputy Luther and Titan arrived at the weigh station, his investigation was still ongoing. As Deputy Luther testified:

> When I arrived at the scale house, I talked to Officer Waalkens. He explained to me that the truck had come back stolen, and he had figured out that it wasn't. And he said that he had—the driver had a lot of miles on his log book that was—raised some suspicion to him. And I asked him if he was done with his paperwork; and he said, no, he wasn't, and that he was gonna bring the driver into the scale house to finish that paperwork.
> . . . .
> When we went to the tractor, had the driver get out, Officer Waalkens explained that he was going to take him to the scale house to finish his paperwork. When he was done talking to him, I introduced myself to him, and said Officer Waalkens has asked me to run my K-9 around his vehicle. And I asked him if there was anything in the vehicle that we should know about and he said no.

The video evidence shows Arrieta accompanying Officer Waalkens to the weigh station as Deputy Luther arrives to the scene.[2] The ensuing sniff took less than four minutes. And Arrieta then consented to the search of the vehicle.

Upon our review of the facts and circumstances presented, we find no indication here that the use of Titan to sniff impermissibly prolonged the encounter. *See State v. Bergmann*, 633 N.W.2d 328, 335 (Iowa 2001) ("[A]ll that we have required in Iowa is that the dog sniff be conducted within a reasonable amount of time from the initial, lawful stop and that the stop is not unduly prolonged without a sufficient basis."). There are several valid reasons why the length of the detention was reasonable, including Officer Waalkens' concerns about the multiple irregularities in Arrieta's logbooks and the fact that Officer Waalkens had not yet

---

[2] Arrieta does not dispute the fact that Officer Waalkens continued his investigation inside the weigh station.

reviewed with Arrieta the final disposition. We also note a significant amount of time was expended trying to resolve the issue of whether the truck was stolen. "Because [Officer Waalkens] was authorized to detain [Arrieta] for purposes of conducting [and completing] the administrative inspection, his request for the canine unit during this time period was also lawful." *See United States v. Steed*, 548 F.3d 961, 974–75, 974 n.10 (11th Cir. 2008) (finding that "[a]s long as [the officer] was authorized to conduct the administrative inspection, no level of suspicion was required for him to request the canine unit during the course of that inspection" (citing *Caballes*, 543 U.S. at 408–09)). We affirm on this issue.

### B. Reliability of the Narcotics Detection Dog

Arrieta challenges the reliability of Titan, pointing to his alleged deficient training records. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide a sufficient reason to trust his alert," and "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246–47 (2013); *accord State v. Carson*, 968 N.W.2d 922, 927–28 (Iowa Ct. App. 2021). This is also true, "even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Harris*, 568 U.S. at 247. "That said, a defendant is entitled 'to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses.'" *Carson*, 968 N.W.2d at 927–28 (noting a defendant may challenge the adequacy

of the dog's certification or training and examining how the dog performed in those settings and in the field (quoting *Harris*, 568 U.S. at 247)).

Specifically, Arrieta cites several entries in Titan's training log in which he "failed to alert" to the presence of narcotics, had a "false alert," and "laid down instead of sitting to alert as trained." Deputy Luther testified about Titan's training, stating he was certified in the fall of 2019, after "approximately 200 hours of training." Since then, Deputy Luther and Titan had participated in ongoing training "a couple times a week—either be narcotics, tracking, or obedience, which he's all certified in." When cross-examined about specific entries in Titan's records, including an instance Titan had been in odor but didn't sit to alert, Deputy Luther acknowledged "[t]here was a problem with [Titan] not sitting" during the first week or two of training, but "[t]hat has since been corrected." He testified that overall, Titan did what he has been trained to do, without any problems. Indeed, on our review of Titan's training records, we observe his performance to be generally successful and consistent with Deputy Luther's testimony.

Arrieta also points to the fact that during Arrieta's stop, Titan alerted to the presence of narcotics only after he was given an "opportunity to go around the truck a second time" and was "prompt[ed]" by Deputy Luther. According to Arrieta, this "demonstrates the dog is neither reliable nor well trained." "[E]ven assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Id.* at 928 (quoting *Harris*, 568 U.S. at 247).

Deputy Luther testified Titan is a "passive alert dog," which means he is "trained to sit" when alerting to the presence of narcotics. Deputy Luther explained the difference between a narcotics detection dog being "in odor" and alerting when searching: "The dog is in odor when I see—well, I hear a breathing change," and "there's also a head snap or a head whip"; but it is not "until the dog sits down" that it is alerting to the "final source"—"[t]he sitting is the final thing." But Deputy Luther acknowledged "[t]here [are] other variations that go into the—the indication." He described Titan's alert to Arrieta's commercial vehicle as follows:

> When I gave the command for the dog to smell an odor of narcotics that he's trained to detect, he immediately showed signs of a breathing change, which is consistent when that happens. As we went around the trailer—we started at the passenger front. We went around to the passenger—or driver's side of the trailer, he showed more signs that he was in odor and that he was really trying to find it. At one point, he actually—it's hard to see on the video, but he actually was walking underneath the trailer with his head up in the air trying to smell where it's coming from.
> I got him back out from underneath the trailer. We went around the rest of the vehicle, got to the front passenger side again and went back around, so went counterclockwise motion and detailed the vehicle. He was still in odor. And when we got to the driver's side compartment where the sleeper—there's like an access door—I had him smell that area. He immediately smelled it and sat, which is an indication that he was in odor.

Deputy Luther further described the "detailing" process as making a "counterclockwise pass where [Luther] now lead[s] the dog" and "direct[s]" Titan's "attention to go to the area" Luther "want[s] him to sniff," including "the areas where the air is going to come out of the vehicle."

Deputy Luther's body cam video shows the following. From the outset of the sniff, Titan can be heard breathing heavily, a sign Deputy Luther described of being in odor. Titan begins the sniff at the front passenger side of the semi-tractor.

They make a quick pass along that side of the vehicle to the rear and around the back of the trailer. Titan exhibits some interest underneath the trailer and doubles back to sniff more in that area along the driver side of the vehicle, during which time Titan is alert and exhibits several head snaps. Just under one minute into the search, Deputy Luther realizes Titan's leash is looped around his neck, so he briefly commands Titan away from the vehicle to untangle him. Titan's first pass around the vehicle is complete approximately ninety seconds after the search began. Deputy Luther then begins to lead Titan on a second, counterclockwise pass to detail the vehicle. Within seconds, Titan shows interest in the sleeper part of the semi-tractor on the driver side and places his front paws on the vehicle, near the front driver side tire, in an effort to sniff higher. Titan then alerts on that area. After Titan is rewarded, he continues the detailing pass on the vehicle. During this second pass, Deputy Luther walks closely to the vehicle and at one point leads Titan by "running [his] hand close" to the seams of the vehicle. The search concludes less than four minutes after it began, with Titan again alerting to the front passenger sleeper part of the semi-tractor. As noted above, a subsequent search uncovered a small amount of marijuana in that area of the vehicle.

The question before us "is whether all the facts surrounding [Titan's] alert[s], viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *See id.* (quoting *Harris*, 568 U.S. at 247). We observe Titan was certified in narcotics detection and had a lengthy training history, so he was "presumed reliable." *See Leib v. State*, No. 21-0972, 2022 WL 108474, at *1 (Iowa Ct. App. Jan. 12, 2022) ("Axel is a certified K-9 officer and thus is presumed reliable."). We further note

Titan generally showed signs of being in odor by head snaps or whips and breathing changes, and he was trained to show a final response by sitting down. Titan exhibited all these behaviors in the video evidence from the August 5 sniff.[3] Upon our review of the evidence presented, and "[b]ased on the exhibition of several alerts common to this dog, we find this sniff was up to snuff." *See Carson*, 968 N.W.2d at 930. In sum, we conclude Titan's "reliable alerts on the vehicle provided the officers with probable cause to search." *See id.* (finding the dog's "reliable alerts" to provide officers with probable cause, even where the dog did not enter a final response on the vehicle).

### C. Physical Contact with the Vehicle

The parties do not dispute that a dog sniff to the exterior of a vehicle does not constitute a search. *See Bergmann*, 633 N.W.2d at 334 ("[A] dog sniff that occurs outside a vehicle is not a search under the meaning of the Fourth Amendment."). But Arrieta argues that Titan's sniff became an unlawful search when he "jump[ed] up on the driver's side of the truck" to "get [his] nose close to the seams of the sleeper cab." Indeed, as noted above, the video evidence shows one instance in which Titan quickly jumped and placed his front paws on the body of the semi-tractor near the front tire, seemingly to sniff higher in the air.

In a similar scenario involving a sniff where the dog placed his paws on a pickup truck, a California court summarized, the dog "jumped and placed his front

---

[3] And specifically, we note that Titan exhibited signs of being in odor prior to any hand gestures by Deputy Luther. *But see State v. Nguyen*, 726 N.W.2d 871, 883 (S.D. 2007) (noting "[h]andler's cues, such as voice or physical signals, have been recognized to compromise a dog's objectivity and impermissibly lead the dog to alert at the suspected item[.]" (citation omitted)).

paws on the body of the car in several places during a walk-around sniff that took less than one minute." *See United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007). The Eighth Circuit held that "[t]his minimal and incidental contact with the exterior of the car was not a tactile inspection of the automobile." *Id.* at 511–12 (observing the contact "did not involve entry into the car; it did not open any closed container; and it did not expose to view anything that was hidden"). Therefore, the court concluded the sniff did not amount to a "constitutionally cognizable infringement." *Id.* at 512 (quoting *Caballes*, 543 U.S. at 409). Here, Titan's action of standing up on his hind legs and putting his front paws on the side of the truck is almost identical to the behavior the Eighth Circuit found constitutional in *Olivera-Mendez*, and we also note the similarity of the conduct upheld in *Carson*. *See* 968 N.W.2d at 928 (observing that "[w]hile making these passes along the vehicle, [the officer] leads [the dog] by running his hand along the vehicle," and "[o]n the pass along the passenger side of the vehicle, [the dog] jumps up onto the car twice"). We reach the same conclusion here.

Upon our review of the issues raised, we affirm the district court's denial of Arrieta's motion to suppress.[4]

**AFFIRMED.**

---

[4] Arrieta raises a new issue in his reply brief, arguing Officer Waalkens had no authority to search the passenger compartment of the truck during a Level III inspection. However, as we have explained, reasonable suspicion to search the tractor cab arose after the dog sniff, and moreover, Arrieta consented to a search of that area. In any event, we generally "will not consider issues raised for the first time in a reply brief." *Villa Magana v. State*, 908 N.W.2d 255, 260 (Iowa 2018). And while there are exceptions, *see id.*, Arrieta does not identify one. We decline to consider this argument.